**SOUTHERN UNION COMPANY,**
a Delaware corporation
Plaintiff,

v.

**SOUTHWEST GAS CORPORATION,**
a California corporation, et al,
Defendants.

No. CV–99–1294–PHX–ROS.

United States District Court,
D. Arizona.

July 31, 2001.

N. Warner Lee, William B. McManus, Ryley, Carlock & Applewhite, P.A., Phoenix, AZ, Eric D. Herschmann, Jessica Mann, Wendy L. Mirsky, Michael M. Fay, Adam Hirshfield, Kasowitz, Benson, Torres & Friedman, LLP, New York City, Tom O. Ferguson, Shelly L. Dalrymple, Sam P. Daniel, Jr., Doerner, Saunders, Daniel & Anderson, Tulsa, OK, Christina Carlson Dodds, Daniel W. Bishop, II, P.C., Austin, TX, for Southern Union Co.

Michael J. O'Connor, Richard R. Thomas, Douglas F. Behm, Michael Scott McCoy, Michael J. Farrell, Jennings, Strouss & Salmon, P.L.C., Phoenix, AZ, Seth Aronson, Marc F. Feinstein, Patrick Lynch, Floy E. Andrews, O'Melveny & Myers, Los Angeles, CA, Michael R. Klein, Steven F. Cherry, Howard M. Shapiro, David P. Donovan, Wilmer, Cutler & Pickering, Washington, DC, Michael J. Bowe, Kasowitz, Benson, Torres & Friedman, LLP, New York City, Todd L. Bice, Schreck, Brignone & Godfrey, Las Vegas, NV, Thomas R. Sheets, Southwest Gas Corp., Las Vegas, NV, Paul J. Cleary, Scott R. Rowland, Boone, Smith, Davis, Hurst & Dickman, Tulsa, OK, for Southwest Gas Corp.

Mark M. Deatherage, Michael M. Kennedy, Tom Henze, Gallagher & Kennedy, P.A., Phoenix, AZ, John J. Swenson, Richard Joseph Doren, Thomas E. Holliday, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA, John Henry Rule, Oliver Sterling Howard, Thomas James Kirby, David E. Keglovits, Amelia A. Fogleman, Gable & Gotwals, Tulsa, OK, for ONEOK, Inc.

David J. Damron, Shannon M. Ivanyi, Sanders & Parks, P.C., Phoenix, AZ, for Michael Maffie.

Michael P. Anthony, Carson, Messinger, Elliott, Laughlin & Ragan, PLLC, Phoenix, AZ, Michael W. Sillman, Brian J. Schulman, Kutak Rock, LLP, Scottsdale, AZ, for James M. Irvin.

Michael D. Kimerer, Thomas V. Rawles, Kimerer & Derrick, PLC, Phoenix, AZ, for John Gaberino.

John R. Hannah, Hoidal & Hannah, PLC, Phoenix, AZ, J. Daniel Campbell, III, Daniel J. O'Connor, Zahnie L. Soe Myint, Jason Edward Hunter, Bell, O'Connor & Campbell, Phoenix, AZ, for Jack D. Rose.

Lawrence A. Hammond, John Alan Stookey, Osborn Maledon, P.A., Phoenix, AZ, for Eugene N. Dubay.

David G. Derickson, William Ridgeway Harrison, David G. Derickson, P.C., Phoenix, AZ, for Tiffany & Bosco.

David G. Derickson, P.C., Phoenix, AZ, for Mark Dioguardi.

Keith Ricker, Ricker & Bustamante, LLP, Phoenix, AZ, for Patrick Black.

Gary Allen Fadell, Fadell, Cheney & Burt, PLLC, Phoenix, AZ, for Laura Winawer.

Eino M. Jacobson, Dewey, AZ, pro se.

Diane Loretta Bornscheuer, Green & Baker, Ltd., Scottsdale, AZ, for Jerry Porter.

N. Warner Lee, William B. McManus, Ryley, Carlock & Applewhite, P.A., Phoenix, AZ, Eric D. Herschmann, Michael M. Fay, Kasowitz, Benson, Torres & Friedman, LLP, New York City, Tom O. Ferguson, Shelly L. Dalrymple, Doerner, Saunders, Daniel & Anderson, Tulsa, OK, for Paul, Smith, Susan Bitter-Smith, and Technical Solutions.

Martin Goyette, California Attorney General's Office, Oakland, CA, for California Public Utilities Commission.

**Amended Order**

SILVER, District Judge.

At a hearing held May 11, 2001, the Court indicated that it would issue an Order directing the parties to submit briefing on choice of law issues, in particular with respect to Counts Three, Seven, and Eight in the Second Amended Complaint ("SAC") in CV–99–1294–PHX–ROS. The Court issued an Order on May 18, 2001, directing the parties to simultaneously file their briefs on the choice of law issues on June 8, 2001. The parties were also directed to simultaneously file any responses to those briefs on June 15, 2001. On June 8, 2001, the Court issued a further Order stating that it would rule on the choice of law issues and on the Motions to Dismiss by June 21, 2001. This is that ruling.

### *Discussion*

**I. Dioguardi**

As a preliminary matter, the Court will address Dioguardi's Motion to Dismiss. Dioguardi is named as a Defendant with respect to Counts Three (Fraudulent Inducement), Seven (Tortious Interference with Business Relationship), and Eight (Tortious Interference with Contractual Relationship), and though the Court has not yet resolved the complex choice of law issues with respect to these claims, the Court finds that ruling on Dioguardi's Motion to Dismiss does not require a preliminary decision on the choice of law.

Dioguardi claims that he cannot be liable on Counts Three, Seven, or Eight, because his only acts were as an attorney for ONEOK, and Southern Union does not specifically allege that Dioguardi personally participated in any fraudulent inducement.[1] Southern Union responds that

1. Dioguardi also argues that he cannot be liable on Count Three because he did not serve as ONEOK's counsel until February 25, 1999, four days after Southern Union and Southwest executed the Standstill Agreement ("Agreement") that was allegedly the result of

fraudulent inducement. Dioguardi also contends that Southern Union has not alleged any act by Dioguardi which could have fraudulently induced Southern Union to contract with Southwest. Dioguardi further avers that

Dioguardi cannot escape liability simply because he served as ONEOK's counsel and argues that attorneys who engage in fraudulent and intentional misconduct are not shielded from liability. Southern Union also asserts that Dioguardi's "involvement in this conspiracy began no later than the week of February 15, 1999, when Rose recommended that ONEOK retain Dioguardi."

■ Several courts have held that an attorney, as the client's agent, is not distinct from the client and therefore cannot engage in a conspiracy with the client. *See Macke Laundry Service Limited Partnership v. Jetz Service Co., Inc.*, 931 S.W.2d 166, 176 (Mo.App.1996) ("*Macke*"); *Skarbrevik v. Cohen, England & Whitfield*, 231 Cal.App.3d 692, 709, 282 Cal. Rptr. 627, 638 (1991); *Doctors' Co. v. Superior Court of Los Angeles County*, 49 Cal.3d 39, 45, 260 Cal.Rptr. 183, 775 P.2d 508 (1989); *Salaymeh v. InterQual, Inc.*, 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 508 N.E.2d 1155, 1158 (1987); *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046, 1079 (1992).[2] However, an attorney may be liable for conspiracy if the attorney "acts out of a self-interest which goes beyond the agency relationship." *Macke*, 931 S.W.2d at 176; *Skarbrevik*, 231 Cal. App.3d at 709, 282 Cal.Rptr. 627 (conspiracy liability may be imposed on an attorney who acts in furtherance of his own financial gain); *Doctors'*, 49 Cal.3d at 45, 260 Cal.Rptr. 183, 775 P.2d 508 ("[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage") (internal quotes and cite omitted); *Fraidin*, 611 A.2d at 1079 ("[T]here can be no conspiracy when an attorney acts within the scope of his employment."). Likewise,

"an attorney may be liable to a third person for acts arising out of the attorney's representation of a client, if the attorney is guilty of 'fraud, collusion, or a malicious or [intentionally] tortious act.'" *Macke*, 931 S.W.2d at 177–78 (cites omitted); *Skarbrevik*, 231 Cal.App.3d at 711, 282 Cal.Rptr. 627; *Engel v. CBS Inc.*, 981 F.2d 1076, 1080 (9th Cir.1992) (applying New York law); *Fraidin*, 611 A.2d at 1080. If a complaint alleges that an attorney is guilty of fraud or collusion, such fraud or collusion must be pled with particularity. Fed. R.Civ.P. 9(b).

A Report and Recommendation issued by Special Master Eino Jacobson on March 7, 2001, ("First R & R") concludes that the SAC fails to state any claims for relief against Dioguardi. Specifically, the First R & R finds:

> The Second Amended Complaint does not allege any personal misrepresentation to Southern Union by Dioguardi, nor does it allege that Dioguardi was acting outside of the scope of his legal employment or for his own, rather than his client's benefit. *The counts for fraudulent inducement and tortious interference rest solely on theories of conspiracies* by the defendants, which would be precluded by Dioguardi's agency with ONEOK.

(First R & R at 4–5) (emphasis added). The First R & R also noted that at the hearing before the Special Master on Dioguardi's Motion, "Southern Union conceded that it does not allege that Dioguardi personally benefitted from his actions." (*Id.* at 5 n. 2).

In its Objections to the First R & R, Southern Union asserts that the cases relied upon in the First R & R actually support Southern Union's position. South-

---

Southern Union has failed to plead fraud with particularity.

2. The parties have not cited any Oklahoma, Nevada, or Arizona cases on this subject.

ern Union does not dispute the First R & R's determination that the SAC fails to allege that Dioguardi personally made misrepresentations to Southern Union, but rather, Southern Union contends that the cases "do not require that attorney-defendants be the actual voice for the misrepresentation at issue." (Southern Union's Objections at 3). Southern Union also does not dispute that the SAC fails to allege that Dioguardi was acting outside the scope of his employment or that he was acting for his personal benefit.

 The Court finds that the First R & R correctly determined that the allegations contained in the SAC are insufficient to state claims for relief against Dioguardi. First, Southern Union failed to allege that Dioguardi was acting outside the scope of his employment as counsel for ONEOK or that he was acting in furtherance of his own financial gain. *See Macke*, 931 S.W.2d at 176; *Skarbrevik*, 231 Cal.App.3d at 709, 282 Cal.Rptr. 627; *Doctors'*, 49 Cal.3d at 45, 260 Cal.Rptr. 183, 775 P.2d 508; *Fraidin*, 611 A.2d at 1079. Second, Southern Union failed to plead fraud against Dioguardi with sufficient particularity. Fed.R.Civ.P. 9(b). Nowhere in Counts III, VII, or VIII does Southern Union set forth any allegations specifically involving Dioguardi. Moreover, the allegations in the SAC do not support a determination that Dioguardi fraudulently induced Southern Union to enter into the Agreement, because Dioguardi did not allegedly serve as ONEOK's counsel until

Gaberino called him four days after the alleged fraudulent inducement was completed.[3] (SAC at ¶ 87); *see also* discussion *infra* at n. 19.

## II. Count Three in the First Arizona Action (CV–99–1294–PHX–ROS)

In Count Three, Southern Union alleges that "all Defendants"[4] fraudulently induced Southern Union to enter into the Agreement. Specifically, Southern Union claims that "Southwest, through Maffie and with the knowledge and consent of the other defendants, represented to Southern Union that Southwest intended to negotiate in good faith regarding the Southern Union offer and that it would conduct a good faith evaluation and due diligence regarding Southern Union." (SAC at ¶ 289). Southern Union then claims that Southwest's representations were false and that Southwest entered the Agreement with the fraudulent intent to prevent Southern Union from approaching Southwest's shareholders with its merger offer. (*Id.*). Southern Union alleges that it relied on Southwest's representations in entering into the Agreement, and as a result, Southern Union was damaged in an amount not less than $750,000,000. (*Id.* at ¶¶ 292–93).

### A. Fed.R.Civ.P. 9(b)

ONEOK[5], Southwest, Irvin, Hartley, Maffie, Zub, and Rose contend that Southern Union has failed to plead fraudulent inducement with the particularity required

---

**3.** The Court finds that the fraudulent inducement is "complete" upon the execution of a contract, but the limitations period does not necessarily begin to run at that time. *See In re Estate of Blake*, 723 N.Y.S.2d 563, 564 (N.Y.A.D.2001) (cause of action accrued, and the limitations period began to run, when the contract was executed); *Coffee v. General Motors Acceptance Corp.*, 30 F.Supp.2d 1376, 1380 (S.D.Ga.1998) (same); *Burton v. Terrell*, 368 F.Supp. 553, 557 (W.D.Va.1973) (same);

*but see* A.R.S. § 12–543(3) (adopting discovery rule for fraud claims); Ca. Civ. Pro. § 338(d) (same).

**4.** Count Three is asserted against "all Defendants," namely: Southwest, ONEOK, Maffie, Hartley, Zub, Dubay, Irvin, Rose, Gaberino, and Dioguardi.

**5.** Irvin, Dubay, and Gaberino joined in ONEOK's Motion.

by Fed.R.Civ.P. 9(b). ONEOK specifically asserts that Southern Union has not alleged that someone at ONEOK made fraudulent representations to someone at Southern Union which induced Southern Union to enter into the Agreement. Likewise, Irvin contends that Southern Union has not alleged that Irvin induced Southern Union to enter into the Agreement or that Irvin made any representations to Southern Union concerning that Agreement. Hartley contends that Southern Union "has not alleged a single fact showing that Hartley had anything to do with" the Agreement. (Hartley Motion at 11–12).

Rule 9(b) provides that "the circumstances constituting fraud ... shall be stated with particularity." [6] "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985). Conclusory allegations of fraud or conspiracy do not satisfy this rule. *Id.; see also Utah State University of Agriculture and Applied Science v. Bear Stearns & Co.*, 549 F.2d 164, 171 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977). "The pleadings must state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994), *cert. denied sub nom Payne v. Kaplan*, 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995); *see also Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir.) (complaint alleging fraud must "set forth the time, place and

contents of the false representation, the identity of the party making the false statements and the consequences thereof.") (internal quotes omitted), *cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 242 (2000). "To allege fraud with particularity, a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir.1994) (*GlenFed*); *see also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir.1997) (citing *GlenFed*).

■ Although allegations of fraud based on "information and belief" typically do not satisfy Rule 9(b), such allegations may suffice if the matters are "peculiarly within the opposing party's knowledge." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987) (internal quotes and cite omitted); *see also Koch*, 203 F.3d at 1202. "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts upon which the belief is founded." *Id.* "In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Wool*, 818 F.2d at 1440. In such cases, "a plaintiff fulfills the particularity required of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." *Id.*

**6.** It is not necessary to resolve the choice of law issue for the purpose of determining whether Southern Union has pled fraud with the degree of particularity required by Fed. R.Civ.P. 9(b), because the law of the Ninth and Tenth Circuits is the same with respect to this issue.

### 1. Southwest and Maffie

A second Report and Recommendation ("Second R & R") issued by Special Master Eino Jacobson finds that with respect to Defendants Southwest and Maffie, Count Three is pled with sufficient particularity.

The SAC alleges that between February 3 and 21, 1999, Maffie told Southern Union's President "that Southwest was prepared to conduct a thorough evaluation" of Southern Union's offer. (SAC at ¶ 50). It further alleges that "Southwest Director Judd has confirmed that the Southwest Board committed to Southern Union that it would conduct a good faith evaluation of the Southern Union Offer." (*Id.*). The SAC also alleges that based upon those representations, Maffie and Southwest, in complicity with the other defendants, induced Southern Union to enter into the Agreement. (*Id.* at ¶ 51). It then alleges that "Southwest and the other defendants never made or intended to make a good faith evaluation of the Southern Union offer." (*Id.* at 52). Southern Union further alleges that the representations made by Maffie and Southwest were false and were made in order to prevent Southern Union from approaching Southwest's shareholders with Southern Union's merger offer. (*Id.* at ¶¶ 52, 289).

 The Court finds that the allegations in the SAC support a claim of fraudulent inducement against Maffie and Southwest and satisfy the particularity requirements of Rule 9(b). *See Lazar v. Superior Court,* 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 381, 909 P.2d 981 (1996) ("An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract."); *see also Havas v. Alger,*

85 Nev. 627, 461 P.2d 857, 859 (1969) ("Fraud in the inducement renders the contract voidable."); *Morris v. Achen Const. Co., Inc.,* 155 Ariz. 512, 514, 747 P.2d 1211, 1212–13 (1987) (discussing the tort of fraudulent inducement and citing the Restatement (Second) of Contracts § 167 (1981)); *Holland v. Perrault Bros., Inc.,* 311 P.2d 795, 798 (Okla.1957). Accordingly, the Court will adopt the Second R & R insofar as it finds that fraudulent inducement is pled with sufficient particularity against Maffie and Southwest.

### 2. Zub, ONEOK, Dubay, Gaberino, Irvin, Rose, and Hartley

It is Southern Union's position that although only Southwest and Maffie made the false representations to Southern Union, the remaining Defendants are liable because they participated in a "conspiracy to defraud Southern Union." (*See* Southern Union's Supplemental Brief at 8). Southern Union does not allege that Zub, ONEOK, Dubay, Gaberino, Irvin, Rose, or Hartley made any statements, false or otherwise, to Southern Union for the purpose of inducing Southern Union to sign the Agreement.

 Southern Union contends that California's civil conspiracy law applies, but it also states that if Arizona conspiracy law applies, there is no apparent conflict between Arizona and California law on this issue.[7] In California, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton*

---

7. Rose and Irvin both argue that Arizona's civil conspiracy law should apply. ONEOK argues that California's civil conspiracy law applies to Count Three, but Arizona's civil conspiracy law applies to Counts Seven and

Eight. However, ONEOK states in its Supplemental Response Brief that Arizona law on civil conspiracy is consistent with California law on civil conspiracy.

*Saudi Arabia Ltd.*, 7 Cal.4th 503, 28 Cal. Rptr.2d 475, 478, 869 P.2d 454 (1994).[8] To establish a civil conspiracy in California, the following elements must be met: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp.*, 40 Cal.App.4th 1571, 47 Cal.Rptr.2d 752, 757 (1995); *see also 117 Sales Corp. v. Olsen*, 80 Cal. App.3d 645, 145 Cal.Rptr. 778, 780 (1978) (a civil conspiracy consists of "a combination of two or more persons to accomplish an evil or unlawful purpose.") (cite omitted).[9] To be liable for tortious conduct by a coconspirator, "[t]he conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." *Kidron*, 47 Cal.Rptr.2d at 758. "[A]ctual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim. Knowledge of the planned tort must be combined with intent to aid in its commission." *Id.* "[O]ne cannot be liable as a coconspirator if the crime was committed before he joined the conspiracy." *Id.* at 765.

For purposes of the Motions to Dismiss, the Court will apply California's civil conspiracy law because there are no appreciable and critical differences between California, Arizona, Nevada, and Oklahoma law regarding the elements required to establish a civil conspiracy. All four jurisdictions hold that there is a civil conspiracy where there are two or more persons who agree to engage in an unlawful act. *See 117 Sales Corp.*, 145 Cal.Rptr. at 780; *Rowland*, 157 Ariz. at 306, 757 P.2d at 110; *Roberson*, 998 P.2d at 201; *Sutherland*, 772 P.2d at 1290.

 Where a plaintiff alleges a conspiracy to commit fraud, Rule 9(b) requires more than conclusory allegations of the conspiracy. *Semegen*, 780 F.2d at 731. Rather, the conspiracy must also be pled with the particularity required by Rule 9(b). *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1521 (N.D.Cal.1990); *see also Wanetick v. Mel's of Modesto, Inc.*, 811 F.Supp. 1402, 1406 n. 3 (N.D.Cal.1992) ("Rule 9(b) requires that a conspiracy to commit fraud be pleaded with the same particularity as the fraud itself."). To satisfy this requirement, a "plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement." *Alfus*, 745 F.Supp. at 1521 (cites omitted). "It is not enough to show that defendants might have had a common goal unless there is a factually specific allegation that they di-

---

8. There is also no separate cause of action for conspiracy in Arizona. *See Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306, 757 P.2d 105, 110 (App.1988). In Nevada and Oklahoma, however, "civil conspiracy" appears to exist as a separate cause of action. *See Siragusa v. Brown*, 114 Nev. 1384, 971 P.2d 801, 807 (1998); *Roberson v. Paine-Webber, Inc.*, 998 P.2d 193, 201 (Okla.Civ. App.1999) (addressing "claim for civil conspiracy," but noting that civil conspiracy alone does not give rise to liability without an unlawful act).

9. In Arizona, a civil conspiracy occurs when "two or more persons ... agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Rowland*, 157 Ariz. at 306, 757 P.2d at 110. Similarly, a civil conspiracy in Oklahoma "consists of a combination of two or more persons to do an unlawful act, or to do an unlawful act by lawful means." *Roberson*, 998 P.2d at 201. The elements of civil conspiracy in Nevada are nearly identical to those required by Arizona and Oklahoma. *See Sutherland v. Gross*, 105 Nev. 192, 772 P.2d 1287, 1290 (1989) ("An actionable conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts.").

rected themselves towards this wrongful goal by virtue of a mutual understanding or agreement." *Id.* (cite omitted); *see also In re Sunrise Technologies Sec. Litig.,* No. C–92–0948TEH, 1992 WL 359636 at *7 (N.D.Cal. Sept.22, 1992) (a plaintiff must plead "an agreement among defendants to engage in an unlawful act," as well as "overt acts by the defendants in furtherance of that agreement").

■ "Although an express agreement need not be shown for a plaintiff to prevail on a civil conspiracy claim, there must be at least a tacit understanding." *In re Sunset Bay Associates,* 944 F.2d 1503, 1517 (9th Cir.1991). "[T]he existence of a conspiracy 'may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances.'" *Id.* (cite omitted). However, a plaintiff must allege specific facts which support the inference of an agreement. *See id.* at 1517–18 (finding that the record evidence supported an inference of a conspiracy in multiple ways and was sufficient to preclude summary judgment); *Alfus,* 745 F.Supp. at 1521; *see also Roberts v. Heim,* 670 F.Supp. 1466, 1484–85 (N.D.Cal.1987) (specific facts must be alleged from which an understanding or agreement may be inferred), *rev'd in part on other grounds, Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 650 (9th Cir.1988), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).

The alleged conspiracy in this case is a "conspiracy to fraudulently induce[.]" (Southern Union's Response to Motions to Dismiss at 56). Southern Union contends that it "provided significant detail of the defendants' conspiracy and concerted action in furtherance of that fraud." (*Id.*). Southern Union then asserts that Defendants "were acting in concert to defraud Southern Union and induce it to enter the Agreement." (*Id.*). Accordingly, the Court concludes that the "goal" of the alleged conspiracy was to defraud Southern Union to enter into the Agreement.

■ As a result, the conspiracy concluded on February 21, 1999, when Southern Union signed the Agreement. *See In re Estate of Blake,* 723 N.Y.S.2d at 564 (fraudulent inducement completed at the time the contract was executed); *Coffee,* 30 F.Supp.2d at 1380 (same); *Burton,* 368 F.Supp. at 557 (same). Thus, any allegations of conduct taken by Zub, ONEOK, Dubay, Gaberino, Irvin, Rose, or Hartley, after February 21, 1999, do not render these Defendants liable if no inference can be drawn from those actions that they were involved in a conspiracy to fraudulently induce Southern Union to enter into the Agreement.[10] *See Kidron,* 47 Cal. Rptr.2d at 765 (no coconspirator liability if an individual joins the conspiracy after the wrongful act is completed). However, the Court will consider actions which were allegedly taken after the conclusion of the conspiracy to determine whether to draw any inferences that Defendants were coconspirators. *See In re Sunset Bay Associates,* 944 F.2d at 1517.

10. Southern Union relies upon *de Vries v. Brumback,* 53 Cal.2d 643, 2 Cal.Rptr. 764, 349 P.2d 532 (1960), for the proposition that actions taken after the Agreement was signed can constitute conspiratorial acts. The Court finds that the decision in *de Vries* is distinguishable, because that case involved a "continuing conspiracy to convert" in which parties joined the conspiracy after the commission of the robbery but before the property was sold, and conversion "is a continuing tort as long as the person entitled to the use and possession of his property is deprived thereof." *Id.,* 2 Cal.Rptr. at 767. As previously stated in this Order, the alleged fraudulent inducement was complete the moment Southern Union entered into the Agreement.

### a. Zub

Regarding Zub, the SAC contains the following pertinent [11] allegations:

(1) Zub is the Senior Vice President/Regulation and Product Pricing of Southwest (SAC at ¶ 13) [12];

(2) Pursuant to the Merger Agreement between Southwest and ONEOK, Zub would become a senior officer [13] of the merged entity (*Id.* at ¶ 36);

(3) Southwest management, "*i.e.,* Maffie", expressed a preference for the Southwest–ONEOK deal (*Id.* at ¶ 45);

(4) Zub and Maffie met with ONEOK representatives at an Arizona club with Rose and Irvin on January 12, 1999, to discuss "the ONEOK–Southwest merger and strategies for regulatory approval" (*Id.* at ¶ 76);

(5) On February 10, 1999, Zub met with ACC Commissioner Kunasek and his aide, Jerry Porter, purportedly to provide an "update" to the ACC on an application that had not yet been filed with the ACC (*Id.* at ¶ 55);

(6) On February 10, 1999, Zub met with Greg Patterson, the Director of the Arizona Residential Utilities Consumer Office, informed Patterson of Southern Union's offer, "and argued that Southern Union's bid for Southwest would not be good for Arizona" (*Id.* at ¶¶ 55, 140);

(7) On February 10, 1999, Zub "falsely stated that if Southern Union's efforts were successful, it would be unable to finance future needs due to a highly leveraged capital structure that would be 88 percent debt" (*Id.* at ¶ 55); and

(8) On February 10, 1999, Zub "falsely stated that Southern Union would have difficulty obtaining regulatory approval" (*Id.*).

■ The Court finds that Southern Union has failed to allege a conspiracy to commit fraudulent inducement against Zub with the degree of particularity required by Rule 9(b). The allegations in the SAC support only the following inferences: that Zub supported a ONEOK–Southwest merger over a Southern Union–Southwest merger; and that Zub made false statements, perhaps with nefarious intent, for the purpose of interfering with Southern Union's chances of obtaining regulatory approval of its merger offer.

Zub's meeting with Maffie, ONEOK representatives, Rose, and Irvin on January 12, 1999, cannot support an inference that Zub was engaging in a conspiracy to fraudulently induce Southern Union to sign the Agreement, because at that time, Southern Union had not yet offered to merge with Southwest and the Agreement could not have been contemplated.[14] (*See* SAC at ¶ 4). Furthermore, Zub's position as a

---

**11.** The Court has read the SAC in its entirety. The Court has also given due consideration to those paragraphs in the SAC which Southern Union believes lend the most support to its fraudulent inducement claim. (*See* Southern Union's Supplemental Brief, Exh. A; *see also* Southern Union's Response to Motions to Dismiss at 56). The Court has also reviewed every other paragraph in the SAC to ascertain whether the allegations are sufficient to establish a nexus between the Defendants named in Count Three (other than Southwest or Maffie) and the conspiracy.

**12.** The SAC does not state the time period during which Zub held this position.

**13.** The SAC does not state whether a position as a "senior officer" with the merged entity would be a promotion, demotion, or equivalent position for Zub.

**14.** Although in May, 1998, Southern Union (through Donaldson Lufkin & Jenrette) allegedly expressed to Maffie an interest in exploring a merger with Southwest, Southern Union does not allege that anybody apart from Maffie knew about this interest. (SAC at ¶ 25). Southern Union alleges that Maffie ignored Southern Union's interest in a merger. (*Id.* at ¶ 27). Southern Union does not allege that Maffie told anyone about Southern Union's expressed interest. In fact, Southern Union

Vice President for Southwest is not, by itself, sufficient to support a reasonable inference that Zub knew about Maffie and Southwest's alleged intentions to fraudulently induce Southern Union to sign the Agreement. The Court cannot discern from the allegations whether Zub's position would have been any better or worse if a merger were consummated between Southwest and ONEOK rather than between Southwest and Southern Union. Finally, the false statements Zub allegedly made do not support an inference that Zub knew about any plans to fraudulently induce Southern Union to sign the Agreement.

The Court also finds that the allegations which link Zub and the other Defendants (apart from Southwest and Maffie) to the alleged fraudulent inducement are not sufficiently particular. The primary section of the SAC which deals with the alleged fraudulent inducement is entitled "Defendants' Fraudulent Scheme to Induce Southern Union To Forego A Tender Offer To Southwest's Shareholders[,]" (SAC at 9), and it includes paragraphs 44 to 59 in the SAC. Southern Union attempts to link these Defendants to the alleged fraudulent inducement by using the following language:

(1) "Maffie and Southwest, in complicity with the other defendants, induced Southern Union to sign the Agreement" (SAC at ¶ 51);

(2) "Southwest and the other defendants never made or intended to make a good faith evaluation of the Southern Union offer" (*Id.* at ¶ 52; *see also id.* at ¶ 2);

(3) "Southwest management, with the necessary and willing assistance of

the other defendants, embarked upon a scheme to manufacture a pretext" (*Id.* at ¶ 53); and

(4) "By fraudulently inducing Southern Union to sign the Agreement, defendants ensured that a 'proxy fight' would not take place" (*Id.* at ¶ 56).

Merely using the term "complicity" and making general allegations that all Defendants were involved in the fraudulent inducement does not satisfy the particularity requirements of Rule 9(b).

Southern Union has not alleged specific facts from which an inference may be drawn that Zub agreed, implicitly or tacitly, with any of the other Defendants that Southern Union should be fraudulently induced to enter into the Agreement. *See Alfus,* 745 F.Supp. at 1521; *In re Sunset Bay Associates,* 944 F.2d at 1517; *Roberts,* 670 F.Supp. at 1484. Nor has Southern Union alleged specific facts from which an inference can be drawn that Zub knew that Southwest and Maffie planned to fraudulently induce Southern Union to sign the Agreement, that Zub concurred in such a plan, or that Zub intended to aid in the commission of the alleged fraudulent inducement. *See Kidron,* 47 Cal.Rptr.2d at 758; *In re Sunrise Technologies Sec. Litig.,* No. C–92–0948TEH, 1992 WL 359636 at *7. The Court will therefore dismiss Count Three as to Zub.

**b. ONEOK, Dubay, and Gaberino**

With respect to ONEOK, Dubay, and Gaberino, the SAC contains the following pertinent allegations:

(1) On December 3, 1998, "ONEOK and Maffie entered into a 'consulting' agreement whereby Maffie was to be paid $3 million upon the closing of a

---

alleges that Maffie did not disclose this information to Merrill Lynch & Co., Inc., Southwest's investment advisor, when Maffie sought advice in connection with a prospective ONEOK merger, nor did Maffie disclose

this information to the Southwest Board of Directors ("Southwest Board") or Southwest Management before a merger agreement was entered into with ONEOK. (*Id.* at ¶¶ 27, 29, 34).

ONEOK–Southwest merger" (SAC at ¶ 31);

(2) Dubay knew about Southern Union's merger offer in early February, 1999 (SAC at ¶ 41);

(3) "On more than one occasion between February 3, 1999 and February 21, 1999, Maffie told Southern Union's President and COO, Peter Kelley, that Southwest was prepared to conduct a thorough evaluation of the Southern Union offer" (*Id.* at ¶ 50);

(4) On February 11 and 15, 1999, Irvin, Rose, Brummett (of ONEOK) and Maffie engaged in telephone discussions (*Id.* at ¶ 54);

(5) During the week of February 16, 1999, representatives of ONEOK participated in meetings with Rose, and subsequently, Rose, Dubay, Gaberino, and Maffie talked about Irvin's desire to prevent a proxy fight or bidding war between ONEOK and Southern Union (*Id.* at ¶ 56);

(6) On January 12, 1999, Rose and Irvin met at an Arizona club with Maffie, Zub, and ONEOK representatives Dubay and Brummett, and at the meeting, they "discussed the ONEOK–Southwest merger and strategies for regulatory approval" (*Id.* at ¶ 76);

(7) Irvin stated to Brummett that it would not be in the shareholders' interest for there to be a bidding war (*Id.* at ¶ 83);

(8) "By fraudulently inducing Southern Union to sign the Agreement, defendants ensured that a 'proxy fight' would not take place" (*Id.* at ¶ 56);

(9) "ONEOK and Rose (and on information and belief, Irvin as well) knew that Southern Union had been fraudulently induced into signing an Agreement that prevented any proxy fight for Southwest" (*Id.* at ¶ 84); and

(10) "ONEOK saved hundreds [of] millions of dollars in that it did not need to best the higher Southern Union offer" (*Id.* at ¶ 186).

The Court finds that these allegations do not support an inference that ONEOK, Dubay, or Gaberino were engaged in a conspiracy to fraudulently induce Southern Union to enter into the Agreement. Rather, these allegations support the following inferences: that ONEOK wanted to consummate a merger between itself and Southwest; that ONEOK knew it was Irvin's desire to prevent a bidding war; that ONEOK knew (apparently after the fact) that Southern Union "had been fraudulently induced" into signing the Agreement; and that ONEOK stood to gain significantly if a merger were consummated on its terms.

Southern Union does not allege any specific facts from which the inference may be drawn that ONEOK, Dubay, or Gaberino implicitly or tacitly agreed that Southern Union should be fraudulently induced to enter into the Agreement. *See Alfus*, 745 F.Supp. at 1521; *In re Sunset Bay Associates*, 944 F.2d at 1517; *Roberts*, 670 F.Supp. at 1484. Southern Union has also failed to allege specific facts from which the inference may be drawn that ONEOK, Dubay, or Gaberino knew that Southwest and Maffie planned to fraudulently induce Southern Union to sign the agreement, that they concurred in such a plan, or that they intended to aid in the commission of the alleged fraudulent inducement. *See Kidron*, 47 Cal.Rptr.2d at 758; *In re Sunrise Technologies Sec. Litig.*, No. C–92–0948TEH, 1992 WL 359636 at *7. The Court will dismiss Count Three as to ONEOK, Dubay [15], and Gaberino.

15. Still outstanding is Dubay's Motion to Dismiss for lack of personal jurisdiction, which

### c. Irvin and Rose

As to Irvin and Rose, the SAC alleges in pertinent part:

(1) "Throughout the first and second quarters of 1999, Rose spoke regularly with ONEOK officials ... for the purpose of, on information and belief,[16] discussing the ONEOK–Southwest merger" (SAC at ¶ 73);

(2) On January 12, 1999, Rose and Irvin met at an Arizona club with Maffie, Zub, and ONEOK representatives, and at the meeting, they "discussed the ONEOK–Southwest merger and strategies for regulatory approval" (*Id.* at ¶ 76);

(3) At that meeting, Rose advised ONEOK how to obtain regulatory approval, and Irvin allegedly "stated that everything Southwest or ONEOK wanted from him was to 'go through' Rose" (*Id.*);

(4) As of February 15, 1999, Rose was aware of Southern Union's offer and advised Dubay of ONEOK to hire Dioguardi (*Id.* at ¶ 79);

(5) On February 15, 1999, Rose traveled to Oklahoma to conduct "due diligence," but he never produced a due diligence report, and on information and belief,[17] Rose was "preparing materials for defendants' scheme to corrupt and mislead both regulatory officials and the Southwest Board" (*Id.* at ¶¶ 79–80);

(6) On February 11 and 15, 1999, Irvin, Rose, Brummett (of ONEOK) and Maffie engaged in telephone discussions (*Id.* at ¶ 54);

(7) During the week of February 16, 1999, Rose met with Kneale (the Vice President–Chief Financial Officer and Treasurer of ONEOK) and counsel for ONEOK (*Id.* at ¶ 56)

(8) "At or about the time of Southern Union's signing of the Agreement," Rose, Dubay, Gaberino, and Maffie talked about Irvin's desire to prevent a proxy fight or bidding war between ONEOK and Southern Union (*Id.*); and

(9) "ONEOK and Rose (and on information and belief,[18] Irvin as well) knew that Southern Union had been fraudulently induced into signing an Agreement that prevented any proxy fight for Southwest" (*Id.* at ¶ 84).

■ The Court finds that these allegations do not support an inference that Irvin or Rose conspired with Southwest and Maffie to fraudulently induce Southern Union to enter into the Agreement. Rather, these allegations support only the following inferences: that Rose and Irvin desired that a merger be consummated

---

the Second R & R recommends be denied because this issue was previously resolved by the Court on September 8, 2000, and Dubay was ordered not to renew this argument. The Court will adopt this aspect of the Second R & R.

**16.** Although allegations based upon information and belief may satisfy Rule 9(b) if they allege matters "peculiarly within the opposing party's knowledge[,]" the allegations must be "accompanied by a statement of the facts upon which the belief is founded." *Wool,* 818 F.2d at 1439. The Court finds that the allegations contained in the SAC support Southern Union's information and belief with respect to this allegation.

**17.** This allegation does not satisfy Rule 9(b). *See Wool,* 818 F.2d at 1439. Southern Union has not alleged sufficient facts from which the Court may infer that the purpose of Rose's trip was iniquitous. *See id.*

**18.** Southern Union fails to proffer specific facts which would support a reasonable inference that Irvin also knew that Southern Union had been (allegedly) fraudulently induced to enter into the Agreement. *See Wool,* 818 F.2d at 1439.

between ONEOK and Southwest, not between Southern Union and Southwest; that once Irvin became aware of Southern Union's offer, he wanted to prevent a bidding war; that Rose advised ONEOK to hire Dioguardi after it learned about Southern Union's merger offer; that Rose intended to mislead regulatory officials and the Southwest Board; and that Rose, and perhaps Irvin, knew that Southern Union *had* been fraudulently induced.

Southern Union does not allege specific facts from which the inference may be drawn that either Irvin or Rose agreed, implicitly or tacitly, that Southern Union should be fraudulently induced to sign the Agreement. *See Alfus,* 745 F.Supp. at 1521; *In re Sunset Bay Associates,* 944 F.2d at 1517; *Roberts,* 670 F.Supp. at 1484. Nor do Southern Union's allegations contain specific facts from which the inference may be drawn that Irvin or Rose knew that Southwest and Maffie planned to fraudulently induce Southern Union to sign the agreement, that they concurred in such a plan, and that they intended to aid in the plan's implementation. *See Kidron,* 47 Cal.Rptr.2d at 758; *See In re Sunrise Technologies Sec. Litig.,* No. C–92–0948TEH, 1992 WL 359636 at *7. The Court will dismiss Count Three with respect to both Irvin and Rose.

### d. Hartley

 With respect to Hartley, the Second R & R finds that Count Three fails to state a claim. The Second R & R concludes that the SAC's allegations against Hartley allege conduct which occurred after the execution and alleged breach of the Agreement. Accordingly, it finds that Hartley cannot be liable for fraudulent inducement, because Hartley did not allegedly do or say anything to induce Southern Union to enter the Agreement, and because Hartley cannot be liable for torts which occurred before he joined the conspiracy. Southern Union has not filed an objection to this determination, but rather, Southern Union states that it "respectfully disagrees with this portion of the Report[.]" (Southern Union's Consolidated Memorandum of Law in Response to Defendants' Objections to the Second R & R at 2 n. 2).

The Court finds that the Second R & R has correctly determined that Southern Union has failed to state a claim against Hartley. The alleged fraudulent inducement began and was completed on February 21, 1999, and Hartley's alleged statements were made on April 5 and 6, 1999.[19] *See In re Estate of Blake,* 723 N.Y.S.2d at 564 (fraudulent inducement completed at the time the contract was executed); *Coffee,* 30 F.Supp.2d at 1380 (same); *Burton,* 368 F.Supp. at 557 (same); *Kidron,* 47 Cal.Rptr.2d at 765 (no coconspirator liability if an individual joins the conspiracy after the wrongful act is completed). The Court will therefore adopt the Second R & R on this issue.

19. For these same reasons, the SAC fails to allege a claim of fraudulent inducement against Dioguardi. Although Rose allegedly suggested during the week of February 16, 1999, that ONEOK retain Dioguardi, Gaberino is not alleged to have called Dioguardi until February 25, 1999, four days after Southern Union signed the Agreement. (SAC at ¶¶ 56, 87). Furthermore, the SAC alleges, upon information and belief, that "Dioguardi was retained for the express purpose of assisting ONEOK and the defendants in editing and presenting the March 8 letter to the Southwest Board." (*Id.* at ¶ 99). There are no allegations that Dioguardi agreed, implicitly or tacitly, that Southern Union should be fraudulently induced to sign the Agreement, or that he knew about a plan to fraudulently induce Southern Union. *See Alfus,* 745 F.Supp. at 1521; *In re Sunset Bay Associates,* 944 F.2d at 1517; *Roberts,* 670 F.Supp. at 1484; *Kidron,* 47 Cal.Rptr.2d at 758; *See In re Sunrise Technologies Sec. Litig.,* No. C–92–0948TEH, 1992 WL 359636 at *7.

## B. Fed.R.Civ.P. 13(a)

Because the Court finds that Count Three should be dismissed with respect to Dioguardi, Zub, ONEOK, Dubay, Gaberino, Irvin, Rose, and Hartley, the only Defendants remaining with respect to Count Three are Southwest and Maffie. The Court must now determine whether Count Three constitutes a compulsory counterclaim in the Nevada action (CV–00–0452–PHX–ROS). Pursuant to Fed.R.Civ.P. 13(a):

> (a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim *and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.* But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

(Emphasis added).

Both Southwest and Maffie are domiciled in Nevada, and were domiciled there at the time the Nevada action commenced, and the Nevada court could have exercised general personal jurisdiction over both of them. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (*Helicopteros*); *Panavision Int'l. L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir.1998) ("General jurisdiction exists when a defen-

dant is domiciled in the forum state or his activities there are 'substantial' or 'continuous and systematic.'") (citing *Helicopteros*); *see also* 28 U.S.C. § 1332(c)(1) (corporation is a citizen of any state where it keeps a principal place of business); Maffie's Supplemental Brief at 3 (stating that he resides in Las Vegas, Nevada, and that Southwest's principal place of business is in Nevada). Accordingly, the Court will identify the fraudulent inducement claim asserted in the SAC as a compulsory counterclaim in the Nevada action.[20]

## C. Choice of Law

Southern Union argues that under Arizona's choice of law principles, California law applies to the fraudulent inducement claim. However, both Southwest and Maffie argue that under Nevada's choice of law principles, Nevada law applies to this claim.

 Because the Court has determined that the fraudulent inducement claim is a compulsory counterclaim in the Nevada action, and because the Nevada court's jurisdiction is premised upon the diversity of the parties, the Court must apply the choice-of-law rules of Nevada. *See Abogados v. AT&T, Inc.,* 223 F.3d 932, 934 (9th Cir.2000) ("court must apply the choice-of-law rules of the state in which it sits."); *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)(when a diversity action is transferred under § 1404(a) from one district court to another, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue."); *KL Group v. Case, Kay & Lynch,* 829 F.2d 909, 915 (9th Cir.1987) (California choice-of-law rules were applied after case was transferred

---

**20.** Because Count Three is a compulsory counterclaim in the Nevada action, it is not a compulsory counterclaim in the Oklahoma

action (CV–00–1812–PHX–ROS). *See* Fed. R.Civ.P. 13(a)(1).

under § 1404(a) from the Central District of California to the District of Hawaii).

▮ Fraudulent inducement is a tort claim. *See, e.g. O'Keefe v. Grenke,* 170 Ariz. 460, 472, 825 P.2d 985, 997 (App. 1992); *Southwell–Gray v. Jones,* No. CIV. 300CV1539–H, 2001 WL 493165 at *3 (N.D.Tex. May 4, 2001) (applying Texas law); *In re Naturally Beautiful Nails, Inc.,* 262 B.R. 131, 134–36 (Bankr.M.D.Fla. 2001) (applying Florida law); *Smith v. Allstate Ins. Co.,* 160 F.Supp.2d 1150, 1153–54 (S.D.Cal.2001) (applying California law); *Holland,* 311 P.2d at 797 (applying Oklahoma law). The question thus presented is whether this claim should be governed by the law selected by the parties in their Agreement.[21]

▮ Ordinarily, tort claims are not governed by a forum selection clause. *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401, 407 (9th Cir. 1992). However, the Restatement (Second) of Conflict of Laws § 201 provides that "[t]he effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application of the rules of §§ 187–188." The courts of Nevada have neither adopted nor rejected § 201, but the Ninth Circuit has held that § 201 provides "the traditional view" and it will apply the choice of law provision in a contract to fraud claims "unless the choice of law provision itself was obtained by a misrepresentation[.]" *Sparling v. Hoffman Const. Co., Inc.,* 864 F.2d 635, 641 (9th Cir.1988) (giving effect to forum selection clause on claim of fraud even though the Washington courts had not yet adopted or rejected § 201).

Citing *Motenko v. MGM Dist., Inc.,* 112 Nev. 1038, 921 P.2d 933 (1996), Southwest argues that the courts of Nevada would not adopt § 201. The *Motenko* court declined to adopt outright the "significant relationship" approach of § 145 of the Restatement (Second) of Conflict of Laws. 921 P.2d at 934–35. However, it did not address the applicability of §§ 201 or 187 of the Restatement to tort claims which require an interpretation of a contract for their resolution.

▮ Like the Ninth Circuit did in *Sparling,* this Court assumes that the courts of Nevada would adopt "the traditional view." This result is consistent with Nevada law, because Nevada has previously relied in part upon § 187 of the Restatement (Second) of Conflict of Laws. *See Ferdie Sievers and Lake Tahoe Land Co., Inc. v. Diversified Mortgage Investors,* 95 Nev. 811, 603 P.2d 270, 273 (1979); *see also Insurance Co. of North America v. Hilton Hotels U.S.A., Inc.,* 908 F.Supp. 809, 814 (D.Nev.1995) (adopting § 188 of the Restatement (Second) of Conflict of Laws and applying Nevada law where the parties failed to point to an actual conflict between Nevada and California law), *aff'd,* 110 F.3d 715 (9th Cir.1997).

Accordingly, the Court must apply § 187 of the Restatement (Second) of Conflict of Laws to determine whether the forum selection clause should be enforced with respect to the fraudulent inducement claim. *See* § 201, Illustration 1 (the choice of law provision must still be effective under § 187 before it is applied). Section 187 provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the

---

21. The Agreement contains the following forum selection provision: "The Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts made, executed, delivered and performed wholly within the State of California without regard to the conflict of laws principles thereof." (ONEOK's Motion to Dismiss, Exh. B).

particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) *The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue,* unless either

 (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

 (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

(Emphasis added). Southern Union contends that § 187(2) governs the analysis, because fraudulent inducement is not something which could have been resolved by an explicit provision in the contract.[22]

The Court concludes that § 187(2) governs whether the forum selection clause should be given effect with respect to the fraudulent inducement claim. As Southern Union correctly points out, fraudulent inducement is an issue "which the parties could not have resolved by an explicit provision in their agreement[.]" § 187(2). It is therefore incumbent upon the Court to determine whether California "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice," or whether it "would be contrary to a fundamental policy of a state which has a materially greater interest than" California if the Court applies California law in the determination of the fraudulent inducement claim. § 187(2)(a) & (b).

Southern Union asserts that there is a substantial relationship between the parties and California, because Southwest is incorporated in California. Southern Union also argues that there are no public policy concerns, because "the law of California on fraudulent inducement and conspiracy is very similar, if not identical, to the law of Arizona."[23] (Southern Union's Supplemental Brief at 6).

The Court finds that there is a substantial relationship between the parties and California, because Southwest is incorporated in California. *See* § 187, comment f (the substantial relationship requirement is met "where one of the parties is domiciled or has his principal place of business" in the selected state); *Consul Limited v. Solide Enterprises, Inc.,* 802 F.2d 1143, 1147 (9th Cir.1986) (the substantial relationship test is met if one of the parties resides in the selected state); *see also Ciena Corp. v. Jarrard,* 203 F.3d 312, 324 (4th Cir.2000) (substantial relationship test is met where one of the parties is incorporated in the selected state).[24] Moreover,

---

**22.** ONEOK, which is no longer a Defendant in Count Three, also submits that § 187(2) is the applicable provision.

**23.** Southern Union has made the assumption that Arizona's choice of law rules rather than the rules of Nevada will be applied. Nevertheless, the Court will consider the similarity between California and Nevada law on fraud-

ulent inducement when determining whether there are public policy concerns with the application of California law.

**24.** Maffie argues that the place of incorporation alone does not satisfy the "substantial relationship" test. However, Maffie subsequently asserts that for purposes of § 145 of the Restatement (Second) of Conflict of Laws,

the SAC alleges that Southwest is in the business of distributing natural gas to customers in California. (SAC at ¶ 8).

The Court also finds that it would not contravene public policy to apply California's fraudulent inducement law, because it is substantially similar to the law of fraudulent inducement in Nevada. *See Barmettler v. Reno Air*, 114 Nev. 441, 956 P.2d 1382, 1386 (1998); *Lazar*, 49 Cal. Rptr.2d at 381, 909 P.2d 981. The elements of a claim of fraudulent inducement in Nevada are as follows:

> (1) A false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.

*Barmettler*, 956 P.2d at 1386. Likewise, promissory fraud in California, as a "subspecies" of fraud, is composed of the following elements:

> (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.

*Lazar*, 49 Cal.Rptr.2d at 380–81, 909 P.2d 981. Southwest does not argue that there are any differences between California and Nevada law with respect to fraudulent inducement claims.

The Court therefore finds that California law applies to the fraudulent inducement claim. This result is also supported by the Ninth Circuit's decision in *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir.1988), which held that a forum selection clause will apply to tort claims if a resolution of the tort claims depends on an interpretation of the contract.[25] *See also Magellan Real Estate Investment Trust v. Losch*, 109 F.Supp.2d 1144, 1160 (D.Ariz.2000) (a "choice of law provision applies only to the extent that part of the wrongdoing alleged in the tort claims requires construction" of the contract); *Fuku–Bonsai, Inc. v. E.I. Du Pont de Nemours and Co.*, 187 F.3d 1031, 1033 n. 3 (9th Cir.1999) ("Under the Restatement, the law selected by the parties in a choice of law provision governs a claim of fraudulent inducement to contract."). Because the alleged fraudulent inducement is based upon promises Southwest allegedly made with respect to its performance on the Agreement, the fraudulent inducement claim "cannot be adjudicated without analyzing whether the parties were in compliance with the [Agreement]" and the claim is within the scope of the forum selection clause. *Manetti–Farrow, Inc.*, 858 F.2d at 514. Furthermore, Southern Union does not contend that the forum selection clause was obtained by a misrepresentation. *See Sparling*, 864 F.2d at 641. The Court therefore concludes that California law applies to the fraudulent inducement claim.

### D. Parol Evidence Rule

Southwest asserts that the parol evidence rule precludes evidence of the statements made by Southwest to Southern Union.[26] Specifically, Southwest contends

---

a court may appropriately consider the place of incorporation when determining which state has the "most significant relationship to the occurrence and the parties." (Maffie's Supplemental Response Brief at 5).

**25.** However, in that diversity action, the *Manetti–Farrow* court did not address the applica-

bility of the Restatement (Second) of Conflict of Laws.

**26.** This argument was originally raised by ONEOK in its Motion to Dismiss, but it was subsequently raised by Southwest.

that the Agreement is fully integrated and it did not impose obligations beyond those stated therein, and in particular, it did not require Southwest to negotiate with Southern Union.

Southern Union argues that the Agreement required Southwest to evaluate Southern Union's merger offer, and contends that because information was actually exchanged pursuant to the Agreement, Southwest was obligated to conduct such an evaluation. Southern Union also opines that the parol evidence rule would not bar it from introducing evidence that Southwest promised to evaluate the merger offer in good faith.

■ The parol evidence rule is statutorily prescribed by the California Code of Civil Procedure § 1856, which provides:

(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

(e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue.

(f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

(g) *This section does not exclude other evidence of the circumstances under which the agreement was made* or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, *or to establish illegality or fraud.*

(h) As used in this section, the term agreement includes deeds and wills, as well as contracts between parties.

(Emphasis added).

The rule is, of course, well settled that, where the parties have reduced to writing what appears to be a complete and certain agreement, it will, in the absence of fraud, be conclusively presumed that the writing contains the whole of the agreement between the parties, and that it is a complete memorial of the same, and parol evidence of prior, contemporaneous or subsequent conversations or representations or statements will not be received for the purpose of adding to or varying the written instrument.

*Ferguson v. Koch*, 204 Cal. 342, 268 P. 342, 344 (1928). According to *Ferguson*, "Parol evidence is always admissible to prove fraud, and it was never intended that the parol-evidence rule should be used as a shield to prevent the proof of fraud." *Id.* at 345, 268 P. 342; *but see Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.App.3d 388, 264 Cal.Rptr. 779, 796 (1989) (criticizing pronouncement that "parol evidence is always admissible to prove fraud" as incorrect).

■ The fraud exception to the parol evidence rule "is not applicable where 'promissory fraud' is alleged, unless the false promise is independent of or consistent with the written instrument." *Id.,* 264 Cal.Rptr. at 795. The fraud exception "does not apply where ... parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement." *Id.* at 796; *see also Banco Do Brasil, S.A. v. Latian, Inc.,* 234 Cal.App.3d 973, 285 Cal.Rptr. 870, 891–92 (1991), *cert. denied,* 504 U.S. 986, 112 S.Ct. 2967, 119 L.Ed.2d 588 (1992); *Alling v. Universal Manufacturing Corp.,* 5 Cal. App.4th 1412, 7 Cal.Rptr.2d 718, 734 (1992); *Bank of America Nat. Trust & Savings Ass'n v. Pendergrass,* 4 Cal.2d 258, 48 P.2d 659, 661 (1935) ("[T]he rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument, or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing."); *see also Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 261 Cal.Rptr. 735, 745–47 (1989) (following *Pendergrass*); *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 281 (9th Cir.1992) (relying on *Price* and *Pendergrass*), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1267, 122 L.Ed.2d 663 (1993).

In this case, Southern Union alleges that it was fraudulently induced to enter into the Agreement. Accordingly, the question presented is whether Southwest's allegedly fraudulent promise is directly at variance with the terms of the Agreement. *See Continental Airlines, Inc.,* 264 Cal.Rptr. at 796.

Southern Union argues that the following promise was made to induce it to enter into the Agreement: Southwest promised to evaluate Southern Union's offer "thoroughly" and in "good faith." (Southern Union's Response at 52). Southern Union contends that the promise made by Southwest is not directly at variance with the terms of the Agreement, because the Agreement provides that Southwest will evaluate Southern Union's offer. The relevant language of the Agreement is as follows:

Each of Southwest Gas Corporation, a California corporation ("Southwest") and Southern Union Company, a Delaware corporation ("SUG"), may furnish certain confidential non-public information to the other party hereto *in order to assist such other party in making an evaluation of SUG's proposal to Southwest dated February 1, 1999* (the "Proposal") ....

*Each Receiving Party hereby agrees to use the Evaluation Material solely for the purpose of evaluating the Proposal* and agrees to keep such information confidential, to treat it with the same degree of care it uses in protecting its own confidential and proprietary data, not to use it in any way detrimental to the Disclosing Party and not to disclose it, directly or indirectly, in any manner whatsoever, provided, however, that (i) any of such information may be disclosed by a Receiving Party to those of its Representatives who need to know such information *for the purpose of evaluating the Proposal* ....

Each party hereto agrees that unless and until a definitive agreement with respect to the Proposal referred to in the first paragraph of the Agreement has been executed and delivered, *neither it nor the other party hereto will be under any legal obligation of any kind whatsoever with respect to such a transaction* by virtue of the Agreement or any written or oral expression with respect to such a transaction by any of its Representatives or by any Representa-

tives thereof *except, in the case of the Agreement, for the matters specifically agreed to herein.*

(Emphasis added).

 The Second R & R finds that no showing was made "to establish how evidence of Southwest's representations that it would negotiate in good faith and evaluate Southern Union's proposal would vary or contradict the obligations of the Agreement to exchange and keep confidential certain information relating to that proposal." (Second R & R at 20). Because the Agreement clearly contemplates by its express terms that Southwest would evaluate Southern Union's proposal,[27] and because implicit in every contract is the obligation to perform in good faith,[28] *see Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal.App.4th 666, 95 Cal.Rptr.2d 583, 595–96 (2000), the Court will adopt the Second R & R with respect to the parol evidence argument.[29]

**27.** At the hearing on the Motions before the Special Master, counsel for ONEOK conceded that one purpose of the Agreement was to evaluate Southern Union's offer. (Reporter's Transcript of 1/12/01 at 42).

**28.** In its Objections to the Second R & R, Southwest cites several cases with respect to this issue: *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988); *Reid v. State Farm Mut. Auto. Ins. Co.*, 173 Cal.App.3d 557, 218 Cal.Rptr. 913 (1985); *Racine & Laramie, Ltd., Inc. v. Dept. of Parks and Rec.*, 11 Cal.App.4th 1026, 14 Cal.Rptr.2d 335 (1992). None of these cases negate a determination that the covenant of good faith and fair dealing applies to all contracts. *See Foley*, 254 Cal.Rptr. at 227, 765 P.2d 373 (holding that the covenant generally cannot form the basis of an independent tort claim); *see Reid*, 218 Cal.Rptr. at 920 (court can determine whether the covenant was breached as a matter of law); *Racine & Laramie, Ltd., Inc.*, 14 Cal.Rptr.2d at 340 (there is no breach of the covenant where a party to a contract declines to renew the contract).

## III. Counts Seven and Eight

### A. Fed.R.Civ.P. 13(a)

On June 5, 2001, the Court held that Counts Seven and Eight[30] do not constitute compulsory counterclaims in the Nevada action. The Court also declined to resolve whether these two counts constitute compulsory counterclaims in the first Oklahoma action (CV–00–1812–PHX–ROS), and it directed further briefing on this issue. ONEOK now argues that Counts Seven and Eight are compulsory counterclaims which should have been asserted in the first Oklahoma action pursuant to Fed.R.Civ.P. 13(a).

Pursuant to Rule 13(a), Counts Seven and Eight are compulsory counterclaims in the first Oklahoma action if they "[arise] out of the transaction or occurrence that is the subject matter" of ONEOK's claims in the first Oklahoma action, and if they do, if the Oklahoma court could have acquired jurisdiction over third parties who are "required" for the claims' adjudication. *See*

**29.** The Court does not hereby render any determination regarding whether the duty to conduct a good faith evaluation required Southwest to accept Southern Union's merger offer after conducting such an evaluation. *See Vestar Development II, LLC v. General Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (holding that damages were too speculative where there was a breach of an agreement to negotiate); *see also Crane Co. v. Coltec Industries, Inc.*, 171 F.3d 733, 736 (2d Cir.1999) (a confidentiality agreement did not constitute an agreement to merge or a commitment to reach such an agreement). However, the fact that regulatory approval was required before a merger could occur does not nullify the tortious interference claims. *See SCEcorp v. Superior Court of San Diego County*, 3 Cal.App.4th 673, 4 Cal.Rptr.2d 372, 375 (1992).

**30.** Counts Seven and Eight are asserted against "all Defendants except Southwest, Hartley, and Zub," namely: ONEOK, Maffie, Dubay, Irvin, Rose, Gaberino, and Dioguardi.

Fed.R.Civ.P. 13(a). As explained below, the Court finds that Count Seven is a compulsory counterclaim in the first Oklahoma action, but only with respect to ONEOK. *See id.* However, because the Court finds that Count Eight should be dismissed as to ONEOK, it cannot constitute a compulsory counterclaim. *See id.*

### 1. Count Seven

#### a. Same Transaction or Occurrence

 As this Court previously held, a "liberal 'logical relationship' test" is applied in order to determine whether a claim "arises out of the same transaction or occurrence" such that it is a compulsory counterclaim. *Pochiro v. Prudential Ins. Co. of America,* 827 F.2d 1246, 1249 (9th Cir.1987). Under this test, the Court must analyze "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Id.* (cite and quotes omitted). The "transaction or occurrence" language is to be read broadly when resolving whether a claim is a compulsory counterclaim. *Id.* at 1252.

Southern Union argues that the decisions in *Hydranautics v. FilmTec Corp.,* 70 F.3d 533 (9th Cir.1995), *Hart v. Clayton–Parker and Associates, Inc.,* 869 F.Supp. 774 (D.Ariz.1994), and *Gilldorn Savings Ass'n v. Commerce Savings Ass'n,* 804 F.2d 390 (7th Cir.1986), support a determination that Count Seven is not a compulsory counterclaim. The Court finds that all three of those cases are distinguishable from the case at bar. In *Hydranautics,* 70 F.3d at 536, the Ninth Circuit held that a claim for predatory patent litigation, which it analogized to a claim of malicious prosecution, was not a compulsory counterclaim in an infringement suit. The Ninth Circuit reached this result because claims for predatory patent litigation are often severed and tried after the reso-

lution of infringement issues, the evidence for such claims "may differ considerably," and there are "different appellate paths [which] Congress has provided for those two kinds of claims." *Id.* In *Hart,* 869 F.Supp. at 777, the district court held that a cause of action for collection on a debt did not constitute a compulsory counterclaim in an action under the Fair Debt Collection Practices Act, because:

> a cause of action on the debt arises out of events different from the cause of action for abuse in collecting. The former centers on evidence regarding the existence of a contract, the failure to perform on a contract, or other circumstances leading to the creation of a valid debt. The latter centers on evidence regarding the improprieties and transgressions, as defined by the FDCPA, in the procedures used to collect the debt, regardless of the debt's validity.

*Id.* (quoting *Ayres v. National Credit Management Corp.,* Civ. A. No. 90–5535, 1991 WL 66845 at *4 (E.D.Pa. Apr.25, 1991)). In *Gilldorn Savings Ass'n,* 804 F.2d at 396, the Seventh Circuit found that a claim arising out of the exchange of preferred stock, where the exchange occurred one year after a stock purchase agreement was entered into and was "totally unrelated" to that agreement, was not a compulsory counterclaim in an action where the claims arose solely out of the sale of a mortgage company pursuant to the stock purchase agreement.

The original complaint filed in the first Oklahoma action asserts four claims for relief against Southern Union: breach of contract, intentional interference with contract, intentional interference with prospective economic advantage, and declaratory judgment. In particular, ONEOK claims that Southern Union breached the Agreement and that ONEOK was a third-party beneficiary of the Agreement.

ONEOK's intentional interference claims are based upon Southern Union's alleged interference with the merger agreement and business relationship between ONEOK and Southwest.

■ Whereas ONEOK's claims are premised upon allegations that Southern Union engaged in conduct which prevented a merger between ONEOK and Southwest, Southern Union's claims against ONEOK are premised upon allegations that ONEOK engaged in conduct which prevented a merger between Southern Union and Southwest. Based upon the unequivocal similarities between these claims and the fact that the resolution of either claim necessitates a determination regarding which party would have merged with Southwest, the Court finds that Count Seven arises out of the same transaction or occurrence as ONEOK's claims in the Oklahoma action, because the essential facts underlying Count Seven and ONEOK's claims "are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *See Pochiro*, 827 F.2d at 1249.

### b. Parties "Required" for Adjudication

ONEOK avers that the Oklahoma court could not obtain general or specific personal jurisdiction over Zub,[31] Irvin, or Rose. ONEOK argues, however, that the only party "required" for the adjudication of Count Seven[32] is ONEOK, because Southern Union can obtain complete relief on this count from ONEOK alone. Accordingly, ONEOK claims that it is irrelevant whether the Oklahoma court could obtain jurisdiction over the remaining Defendants named in Count Seven.

Some courts have held that a party is not "required for adjudication" for purposes of Rule 13(a) unless that party is a necessary party pursuant to Rule 19(a). *See Harley–Davidson Motor Co. v. Chrome Specialties, Inc.*, 173 F.R.D. 250, 253 (E.D.Wis.1997) (finding that co-conspirators were not "required" for adjudication because it is well-established that co-conspirators are not "indispensable" parties under Rule 19(a)); *Grumman Systems Support Corp. v. Data General Corp.*, 125 F.R.D. 160, 165 (N.D.Cal.1988); *see also Asset Allocation and Management Co. v. Western Employers Ins. Co.*, 892 F.2d 566, 574 (7th Cir.1989) (counterclaims are permissive as to defendants over whom the court cannot acquire jurisdiction unless their presence is "required"); *Owens v. Blue Tee Corp.*, 177 F.R.D. 673 (M.D.Ala.1998) (same). "[T]he compulsory counterclaim rule could be easily defeated by the naming of additional counterclaim defendants" who are not required for adjudication. *See Asset Allocation and Management Co.*, 892 F.2d at 574; *see also Grumman Systems Support Corp.*, 125 F.R.D. at 165 (noting that "it would be easy to 'end-run' Rule 13(a)" to find that a counterclaim is not compulsory where additional, unnecessary defendants are added).

■ Citing only *Super Natural Distributors, Inc. v. MuscleTech Research and Development*, 140 F.Supp.2d 970 (E.D.Wis.2001), and *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 952 F.Supp. 1399, 1408–09 (D.Neb.1997), Southern Union urges the Court not to interpret the word "require" in Rule 13(a) as synonymous with Rule 19. Neither of those two cases, however, addresses the meaning that should be ascribed to the word "require" in Rule 13(a). The Court

---

**31.** Zub is not named as a Defendant in Count Seven.

**32.** ONEOK asserts this same argument with respect to Count Eight.

finds the reasoning in *Harley–Davidson Motor Co., Grumman Systems Support Corp., Owens,* and *Asset Allocation and Management Co.* persuasive, and concludes that a party is "required" for purposes of Rule 13(a) if the party is an indispensable party pursuant to Rule 19.

 "To determine whether a party is 'indispensable' under Fed.R.Civ.P. 19, a court must undertake a two-part analysis: it must first determine if an absent party is 'necessary' to the suit; then if, as here, the party cannot be joined, the court must determine whether the party is 'indispensable[.]'" *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990). The burden is on the party seeking to establish the indispensability of another party. *Id.* Under Rule 19(a), a party is necessary if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

If a party satisfies either of the two prongs set forth in Rule 19(a), it is a necessary party. *Yellowstone County v. Pease,* 96 F.3d 1169, 1172 (9th Cir.1996), *cert. denied,* 520 U.S. 1209, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997). The complete relief factor "is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). If meaningful relief can be fashioned in a party's ab-

sence, the first prong of Rule 19(a) is not met. *Id.* The second prong cannot be met unless the party has a "legally protected interest in the suit." *Makah Indian Tribe,* 910 F.2d at 558. "This interest must be more than a financial stake, and more than speculation about a future event." *Id.* (cites omitted).

It is ONEOK's contention that "Southern Union could have obtained complete relief from ONEOK alone in the Oklahoma action[.]" (ONEOK's Supplemental Brief at 14). Southern Union does not address this contention in its Supplemental Response Brief. The Court finds that complete relief can be accorded to Southern Union against ONEOK, because the absence of Irvin or Rose in the Oklahoma action will not "preclude the [Court] from being able to fashion meaningful relief as between the parties[.]" *See Northrop Corp.,* 705 F.2d at 1043.

The primary purpose of determining whether Count Seven is a counterclaim in the Oklahoma action is to determine the proper alignment of Southern Union vis-a-vis ONEOK. It will not result in a dismissal of this claim against Irvin or Rose. Assuming that Irvin and Rose can claim a legally protected interest in the subject of this action, there is no "risk of incurring double, multiple, or otherwise inconsistent obligations[,]" because the Court anticipates that the tortious interference with a business relationship claim against Irvin and Rose will be tried together with the tortious interference with a business relationship claim against ONEOK. *See* Rule 19(a)(2). For this same reason, Irvin and Rose's ability to protect their interests will not be impaired or impeded. *See* Rule 19(a)(1).

The Court therefore finds that Irvin and Rose are not necessary, and thus not indispensable, for the adjudication of Count Seven. Accordingly, Count Seven is a

compulsory counterclaim in the Oklahoma action with respect to ONEOK, and it will be identified as such. *See* Fed.R.Civ.P. 13(a). However, the Court also finds that Count Seven is a direct claim in the Arizona action against Irvin, Rose, Dubay, and Gaberino.

### 2. Count Eight

The Court further finds, however, that Count Eight is not a compulsory counterclaim because it should be dismissed with respect to ONEOK, and counterclaims are only compulsory against an "opposing party[.]" *See* Fed.R.Civ.P. 13(a). In its Motion to Dismiss, ONEOK argued for the dismissal of Count Eight because ONEOK was a third-party beneficiary of the Agreement. Southern Union responded that ONEOK is not immune from liability on Count Eight because ONEOK is not a third-party beneficiary to the Agreement, in whole or in part. Southern Union alternatively contends that if ONEOK is a third party beneficiary to certain provisions in the Agreement, it is not a third party beneficiary as to the entire agreement.

"The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract." *Atlanta Market Center Management Co. v. McLane*, 269 Ga. 604, 503 S.E.2d 278, 283 (1998); *see also Payne v. Pennzoil Corp.*, 138 Ariz. 52, 57, 672 P.2d 1322, 1327 (App.1983) (for a plaintiff to succeed on a claim of intentional interference with contractual relations against a defendant, "[t]he contract must be one between the plaintiff and a third party."); *Barrow v. Arizona Board of Regents*, 158 Ariz. 71, 78, 761 P.2d 145, 152 (App.1988) (where a defendant acts "for the company" and the contract is between the company and the plaintiff, the defendant is considered to be the company and thus is not capable of interfering with the contract); *but see Butler v. Sears Roebuck & Co.*, No. C 92–1842 FMS, 1992 WL 364779 at *4 (N.D.Cal. Oct.20, 1992) (where the defendant was acting to protect his own interests rather than those of the company, he may be liable for tortious interference).

To support the proposition that ONEOK could be a third-party beneficiary to part, but not all, of the Agreement, Southern Union cites J. Calamari & J. Perillo, *The Law of Contracts*, 649 (4th Ed.1998), which states: "It is possible that, in a contract where the promisor makes a number of promises, the third party beneficiary may be the beneficiary of one promise but not of another." Although the Court agrees that with respect to some contracts, a third party may be a beneficiary with respect to only part of a contract, that is not the case here.

In an Order filed May 11, 1999, the United States District Court for the Northern District of Oklahoma held that ONEOK is a third-party beneficiary of the Agreement and that ONEOK was entitled to enforce that agreement under California law. (ONEOK's Reply in Support of Motion to Dismiss, Exh. A at 8–9).[33] The Oklahoma court found "that the parties clearly intended to benefit ONEOK at the time the [Agreement] was executed." (*Id.* at 8). It further stated that "it is clear that the parties to the [Agreement] contemplated that participation in the process described in both the [Agreement] and the ONEOK/Southwest Gas Letter Agreement would benefit ONEOK because under certain circumstances future hostile activities would be prohibited." (*Id.*).

---

**33.** Southern Union submits, without any legal argument, that the Oklahoma court erred in rendering that decision. It is not clear whether Southern Union ever sought reconsideration of the Oklahoma court's ruling.

██ The Second R & R finds that though ONEOK was a third-party beneficiary of the Agreement to the extent that ONEOK could enforce an injunction under the Agreement, ONEOK was not a third-party beneficiary with respect to the provisions of the Agreement which · required Southwest to evaluate Southern Union's offer, because ONEOK could not secure a benefit from those provisions. The Court declines to adopt this finding. The District of Oklahoma has determined that ONEOK was a third-party beneficiary to the Agreement, and it drew no distinction between aspects of the agreement for which ONEOK was not a third-party beneficiary and those aspects of the agreement for which it was. Moreover, ONEOK benefitted from the Agreement as a whole. Although the Agreement obligated Southwest to evaluate Southern Union's merger offer, ONEOK benefitted from the entire agreement because its terms prevented Southern Union from bringing its merger offer to Southwest's shareholders. In fact, the "no shopping" provision in the merger agreement between ONEOK and Southwest required that such an agreement be entered in the event that other companies offered to merge with Southwest. (ONEOK's Reply, Exh. B at 26, § 5.2(a)). As a result, ONEOK cannot be liable for its alleged intentional interference with the Agreement.[34] *See McLane,* 503 S.E.2d at 283.

### B. Maffie

██ Maffie argues that he cannot be liable for tortious interference under either Count Seven or Eight, because at all times, he was acting as the President, CEO, and a Director on the Southwest Board. For reasons which follow, the Court agrees.

██ Where an officer is acting on behalf of the corporation, he is for all practical purposes "the corporation." *See Payne,* 138 Ariz. at 57, 672 P.2d at 1327. As a result, such an officer can no more interfere with the corporation's contracts than he can interfere with the corporation's business relationships—they are his own. *See id.; see also King v. Sioux City Radiological Group, P.C.,* 985 F.Supp. 869, 882 (N.D.Iowa 1997) ("the tort of tortious interference with a business advantage is premised on the acts of a stranger to the relationship interfering with relations between the plaintiff and another"); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So.2d 381, 386 (Fla.App. 1999) (tortious interference claim requires the interfering party to be a stranger to the business relationship); *Hannon v. Avis Rent A Car System, Inc.,* 107 F.Supp.2d 1256, 1262 (D.Mont.2000) (same); *First Trust Nat'l Ass'n v. Moses & Singer,* No. 99 Civ.1947 JSM, 2000 WL 1093054 at *7 n. 5 (S.D.N.Y. Aug.4, 2000) (same).

"However, when a defendant is both an agent of a party to the contract and the person accused of tortious interference, a plaintiff may assert the cause of action by additionally proving the defendant acted so contrary to the principal's interests *that his actions could only have been motivated by personal interests.*" *Dalrymple v. University of Texas System,* 949 S.W.2d 395, 405 (Tex.App.1997) (emphasis added) (citing *Holloway v. Skinner,* 898 S.W.2d 793, 796 (Tex.1995)), *rev'd in part on other grounds sub nom Brewerton v. Dalrymple,*

---

**34.** This determination does not extend to Count Seven. ONEOK's status as a third party beneficiary shields it from liability only with respect to a claim of tortious interference with a contractual relationship, not to a claim of tortious interference with a business relationship, because the business relationship allegedly interfered with extends far beyond the Agreement.

997 S.W.2d 212 (Tex.1999); *see also Butler*, No. C 92–1842 FMS, 1992 WL 364779 at *4 (inquiry is whether the employee "was acting to protect his own interests rather than that of the entity"); *Murray v. St. Michael's College*, 164 Vt. 205, 667 A.2d 294, 300 (1995) ("[T]he tort is applicable in limited situations against other employees or officers of the plaintiff's employer, the key factor being whether the defendants were acting outside the scope of their employment *to further their own interests.*") (emphasis added). "Proof of mixed motives is insufficient to create liability." *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir.1998) (applying Texas law) (citing *Holloway*, 898 S.W.2d at 796), *cert. denied*, 526 U.S. 1065, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999). Moreover, "the mere existence of a personal stake in the outcome, especially when any personal benefit is derivative of the improved financial condition of the corporation or consists of the continued entitlement to draw a salary, cannot alone constitute proof that the defendant committed an act of willful or intentional interference." *Holloway*, 898 S.W.2d at 796.

The Second R & R finds that even though Maffie was the President, CEO, and a Director on the Southwest Board, Maffie was not a party to the contract because he was allegedly acting in his own interest to protect a $3 million consulting contract with ONEOK. The Court declines to adopt this finding, because at the hearing before the Special Master, Southern Union conceded that Maffie would have been paid the same $3 million consulting fee if there had been a merger between Southern Union and Southwest. (Reporter's Transcript of 1/12/01 at 131). The $3 million therefore could not have motivated Maffie to prefer a ONEOK–Southwest merger over a Southern Union–Southwest merger, *see Dalrymple*, 949 S.W.2d at 405, and it was not necessary for him to favor a ONEOK–Southwest merger in order to protect his interest in the $3 million consulting fee, *see Butler*, No. C 92–1842 FMS, 1992 WL 364779 at *4. Accordingly, because Maffie was the President, CEO, and a Director on the Southwest Board, for all practical purposes he was a party to the contract. *See Payne*, 138 Ariz. at 57, 672 P.2d at 1327; *Barrow*, 158 Ariz. at 71, 761 P.2d at 152. The Court will therefore dismiss Counts Seven and Eight with respect to Maffie.

### C. Choice of Law

Southern Union, Rose, Irvin, and ONEOK argue that Arizona law applies to Counts Seven and Eight.[35] Because there is no disagreement on the applicable law among the parties remaining with respect to these counts, the Court will cede to the parties and find that Arizona law applies to the tortious interference claims.

### D. Failure to Allege Business Relationship or Expectancy

ONEOK argues that Count Seven should be dismissed because Southern Union has failed to allege facts sufficient to establish that a business relationship or expectancy ever existed. Irvin has also moved to dismiss Count Seven on this basis.

The elements of a claim of intentional interference with a business relationship are as follows:

(1) The existence of valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

---

**35.** Dioguardi also argues that Arizona law applies to these claims. Only Maffie, who is no longer a Defendant with respect to these claims, argues that Nevada law should apply.

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau of Maricopa County, Inc.*, 130 Ariz. 523, 530, 637 P.2d 733, 740 (1981) (internal quotes and cites omitted).[36] "In addition to proving the four elements stated in *Antwerp, supra*, the plaintiff bringing a tortious interference action must show that the defendant acted improperly." *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985). To determine whether a particular action is improper, seven factors are considered:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.* at 387, 710 P.2d at 1042 (citing the Restatement (2d) of Torts § 767).

The Second R & R finds that a business relationship was established by the Agreement. It also finds that the SAC alleges "in great detail" the actions which allegedly thwarted Southern Union's attempts to acquire Southwest. The Second R & R does not contain any specific citations to the SAC to support this finding. However, the Court has thoroughly reviewed the SAC and finds that Southern Union has adequately alleged that a business relationship existed between itself and Southwest. (*See* SAC at ¶¶ 310–12).

### E. Causation

Irvin argues that because Southwest never intended to accept Southern Union's offer, Irvin could not have caused a breach of the Agreement or the termination of any business expectancy. The Second R & R finds that Southern Union has alleged sufficient facts to establish causation.

■ To prevail on a claim of tortious interference with a business relationship "when the relationship is prospective, there must be a reasonable assurance that the contract or relationship would have been entered into[.]" *Megawatt Corp. v. Tucson Elec. Power Co.*, CIV No. 86–173 PGR TUC, 1989 WL 95602 *8 (D.Ariz. May 26, 1989). In the context of a "bidding war," a plaintiff "must be able to prove with a reasonable assurance that it would have prevailed in the bidding ... but for the interference[.]" *Id.* "[T]he existence of regulatory approval as a condition precedent to completion of [a] merger" does not prevent a plaintiff from prevailing on a cause of action for tortious interference. *SCEcorp*, 4 Cal. Rptr.2d at 375.

■ In this case, Southern Union alleges that "[w]ithout defendants' wrongful acts ... the Southwest Board would have had no choice but to accept the financially superior Southern Union offer and Southern Union's offer would have been approved by Southwest's shareholders."

---

**36.** The elements of a claim of tortious interference with contract are virtually identical to those of tortious interference with a business relationship, but they are separate claims.

*See Bruce Church, Inc. v. United Farm Workers of America, AFL–CIO*, 169 Ariz. 22, 34, 816 P.2d 919, 931 (App.1991).

(SAC at ¶ 313). Southern Union also alleges that "Southwest Director Judd has testified that all things being equal, the higher offer should have prevailed." (*Id.*). The Court finds that these allegations are sufficient to support a finding on causation, and the Court will adopt the Second R & R on this issue.

### F. Noerr–Pennington

Rose claims immunity under the Noerr–Pennington doctrine on the tort claims.[37] In his Motion to Dismiss, Irvin claims he is entitled to immunity under the Noerr–Pennington doctrine with respect to the federal RICO claim. Irvin did not claim he was entitled to immunity under that doctrine with respect to any of the state tort claims. However, in his Objections to the Second R & R, Irvin asserts that he is entitled to immunity under that doctrine to the extent that Southern Union's allegations are based on his lobbying activities.

The Noerr–Pennington doctrine is premised upon two separate Supreme Court decisions: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr*, the Supreme Court held that the Sherman Act was not violated by a railroad's campaign to obtain governmental action in the railroad's favor despite the anticompetitive motivation of the railroad. 365 U.S. at 136–40, 81 S.Ct. 523. Likewise, *Pennington* held that "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose." 381 U.S. at 670, 85 S.Ct. 1585. The Noerr–Pennington doctrine does not extend to attempts to influence private associations. *Allied Tube &*

*Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501–02, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). However, it does protect government officials acting in their official capacities, and the doctrine has been extended to claims not involving antitrust law. *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1093–94 (9th Cir.2000).

The Noerr Court noted that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144, 81 S.Ct. 523. Under the "sham exception" to the doctrine, a plaintiff must allege "the existence of a publicity campaign" and that the campaigning defendant "was not genuinely seeking official action[.]" *Boone v. Redevelopment Agency of the City of San Jose*, 841 F.2d 886, 895 (9th Cir.), *cert. denied*, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988). A conspiracy to prevent a company from obtaining meaningful access to an adjudicative body falls within the "sham exception." *See Hospital Building Co. v. Trustees of Rex Hospital*, 691 F.2d 678, 687 (4th Cir.1982), *cert. denied*, 464 U.S. 890, 104 S.Ct. 231, 78 L.Ed.2d 224 (1983). In addition, "illegal or fraudulent lobbying activities that would normally be immunized by Noerr–Pennington lose their protection if they occur in a judicial or quasi-judicial setting[.]" *Boone*, 841 F.2d at 895–96; *see also Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294, 1307 (Fed.Cir.1999) ("Noerr–Pennington does not protect conduct which is otherwise unlawful."), *cert. denied*, 528

---

**37.** Rose did not make Noerr–Pennington arguments of his own, but rather, joined in Dioguardi's Motion to Dismiss the tortious interference claims based on the Noerr–Pennington doctrine.

U.S. 1115, 120 S.Ct. 933, 145 L.Ed.2d 812 (2000); *In re American Continental Corp./Lincoln Savings and Loan Securities Litigation,* 794 F.Supp. 1424, 1448 (D.Ariz.1992) ("Noerr–Pennington does not ... protect those who use the legislative or judicial process as an anti-competitive weapon, with no expectation of obtaining legitimate government action.").

The Second R & R finds that neither Irvin nor Rose are entitled to immunity under the Noerr–Pennington doctrine. Specifically, it finds that Southern Union's allegations that Irvin and Rose lied to and defrauded regulatory officials in Nevada, California, and Arizona, would constitute unlawful conduct which is not protected by the Noerr–Pennington doctrine. It further finds that the actions allegedly taken by Rose and Irvin would fall within the "sham exception" to the Noerr–Pennington doctrine.[38]

The Court finds that Southern Union's allegations, if true, would not permit Irvin or Rose to be shielded from liability pursuant to the "sham exception." The SAC alleges in pertinent part:

(1) Defendants arranged for Irvin and Rose "to lobby for the ONEOK–Southwest merger" (SAC at ¶ 63);

(2) Irvin and Rose met with "utility commissioners from California and Nevada in an attempt to influence their review process against a Southern Union–Southwest merger" (*Id.*);

(3) A scheme was developed whereby "Irvin and Rose, putatively representing the interests of the ACC, would contact the relevant regulatory bodies in California and Nevada to lobby for the ONEOK–Southwest deal" (*Id.* at ¶ 94);

(4) Irvin and Rose traveled to the San Francisco offices of the CPUC (California Public Utilities Commission) on March 16, 1999, to persuade CPUC officials to favor a ONEOK–Southwest deal (*Id.* at ¶ 101);

(5) Irvin and Rose met with PUCN (Public Utilities Commission of Nevada) officials (*Id.* at ¶ 125);

(6) Irvin told PUCN's chairwoman "that California and Nevada should be concerned about the Southwest merger[,]" and Rose told the chairwoman that ONEOK was the superior merger candidate (*Id.* at ¶ 128);

(7) Irvin and Rose falsely purported to be representing the ACC's interests (*Id.* at ¶ 105);

(8) Irvin and Rose "prepared and presented a letter to the Southwest Board that conveyed the false message that commissioners from all three states had concerns about whether the Southern Union offer could win regulatory approval" (SAC at ¶ 63);

(9) The letter falsely implied that a merger with Southern Union would be more expensive, more difficult to finance, and less likely to obtain regulatory approval (*Id.* at ¶ 113);

(10) The trip to the CPUC was for the purpose of making misleading and false statements to CPUC officials about Southern Union's capital structure and the potential for higher rates for Southwest customers (*Id.* at ¶ 103);

(11) Irvin and Rose presented the NPUC chairwoman with the March 8 letter and falsely stated that the

---

**38.** In his Objections to the Second R & R, Rose appears to concede that Southern Union's allegations, if true, support a determination that Rose's conduct falls within the "sham exception."

letter had been approved by the CPUC President (*Id.* at ¶ 130); and

(12) The ACC and the CPUC are "quasi-judicial bodies" (*Id.* at ¶¶ 66, 109).

This conduct in which Southern Union alleges Rose and Irvin purportedly engaged falls within the "sham exception" to the Noerr–Pennington doctrine, because the allegations would support a finding that Irvin and Rose attempted to prevent Southern Union from obtaining meaningful review by the regulatory bodies of California, Nevada, and Arizona. *See Hospital Building Co.*, 691 F.2d at 687. Moreover, to the extent Southern Union claims that Irvin and Rose attempted to defraud the Southwest Board, a non-governmental entity, such conduct is not protected by the Noerr–Pennington doctrine. *See Allied Tube & Conduit Corp.*, 486 U.S. at 501–02, 108 S.Ct. 1931. The Court will therefore adopt the Second R & R's determinations with respect to the Noerr–Pennington doctrine.

### IV. Contract Claims Between Southwest and Southern Union

Southwest generally asserts that California law applies to "all contract claims" without specifically identifying the actions containing those claims or the claims

themselves. However, Southern Union does not argue that California law should not apply to the contract claims, presumably because it is Southern Union's position that the forum selection clause should be enforced with respect to the fraudulent inducement claim. Accordingly, the Court finds that California law applies to all contract claims between Southwest and Southern Union.[39]

### V. Tort Claims Between Southwest and Southern Union

Southwest generally asserts that Nevada law should apply to all of its tort claims against Southern Union, *including* tort claims which Southwest is prosecuting in an action it filed in Arizona, CV–00–119–PHX–ROS ("second Arizona action")[40] nearly nine months after Southwest commenced the Nevada action. Southwest specifically asserts that Nevada law should apply to its claims for misappropriation of trade secrets,[41] intentional interference with contract,[42] and intentional interference with prospective economic advantage.[43]

In its Supplemental Response Brief, Southern Union asserts that Southwest's argument that Nevada's choice of law applies to the tort claims asserted in the second Arizona action is "incredible."

---

**39.** Irvin, who is not a party to the Agreement, also contends that California law governs these three claims.

**40.** The only tort claims asserted against Southern Union in the second Arizona action are Counts Eight and Nine. Count Eight alleges intentional interference with contract, and Count Nine alleges misappropriation of trade secrets. Other claims against Southern Union in the second Arizona action are for breach of contract (Count Six), breach of the covenant of good faith and fair dealing (Count Seven), and declaratory relief regarding the rights and liabilities of the parties on the contract (Count Ten). Southwest asserts that Count Seven is a contract claim. The second

Arizona action contains claims against both Southern Union and ONEOK.

**41.** Count Three in the Nevada action, and Count Nine in the second Arizona action, allege misappropriation of trade secrets.

**42.** Count Four in the Nevada action, and Count Eight in the second Arizona action, allege that Southern Union intentionally interfered with the merger agreement between ONEOK and Southwest.

**43.** Count Five in the Nevada action alleges that Southern Union intentionally interfered with Southwest's prospective economic advantage.

(Southern Union's Supplemental Response Brief at 3 n. 2). However, Southern Union then fails to assert whether Arizona, Nevada, or California law should apply to Southwest's tort claims, and it fails to identify any differences between the law of those states on the alleged torts.[44] Because Southern Union has not disputed Southwest's assertion that Nevada law should apply to Southwest's tort claims asserted in the Nevada action, the Court will apply Nevada law to those claims.

However, to the extent Southwest has asserted tort claims in the second Arizona action which are identical to claims it initially asserted in the Nevada action, the Court questions whether the claims in the second Arizona action are duplicative and should be dismissed.[45] *See Alltrade, Inc. v. Uniweld Products, Inc.,* 946 F.2d 622, 623–27 (9th Cir.1991) (duplicative actions may in some cases be dismissed under the "first to file rule"). Because of this lingering question, the Court will not resolve the choice of law issues with respect to the tort claims asserted by Southwest against Southern Union in the second Arizona action.

## VI. Claims Between Southwest and ONEOK

Southwest asserts that ONEOK's claims against Southwest in the second Oklahoma action, CV–00–1775–PHX–ROS, should be considered compulsory counterclaims in the second Arizona action. Although ONEOK was first to file its action, which at that time contained only a claim for declaratory relief, Southwest argues that ONEOK's action was an anticipatory filing

aimed at avoiding the Arizona court. Applying Arizona's choice of law principles, Southwest concludes that Oklahoma law applies to the contract claims, based upon a forum selection clause, and Arizona law applies to Southwest's tort claims.

ONEOK has moved to strike these arguments because they were not ordered by the Court. Alternatively, it argues that Southwest's claims in the second Arizona action should have been asserted as compulsory counterclaims in the second Oklahoma action, and that all claims between Southwest and ONEOK are governed by Oklahoma law.

The Court will deny ONEOK's Motion to Strike. Although the Court did not order that the choice of law issues be briefed with respect to the claims between Southwest and ONEOK, the Court finds that those claims involve critical, complex choice of law issues which must be resolved in order for this consolidated action to proceed in an efficient manner.

### A. First to File Rule

The "first to file rule" is a well-established rule "which allows a district court to transfer, stay, or dismiss an action when a similar complaint has already been filed in another federal court[.]" *Alltrade, Inc.,* 946 F.2d at 623. Premised upon the doctrine of federal comity, the rule "was developed to 'serve[ ] the purpose of promoting efficiency well and should not be disregarded lightly.'" *Id.* at 625 (quoting *Church of Scientology of California v. United States Dept. of the Army,* 611 F.2d 738, 750 (9th Cir.1979)) (alteration in original); *Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678

---

**44.** Rather, in the context of Southern Union's own tortious interference claims, it asserts that "neither Southwest nor Maffie has identified any conflict in the laws of Arizona and Nevada with respect to the tortious interference claims." (Southern Union's Supplemental Response Brief at 7).

**45.** This same question is raised with respect to the contract claims asserted by Southwest against Southern Union in the second Arizona action, but it is not as critical because Southwest and Southern Union agree that the choice of law provision in the Agreement should be given effect.

F.2d 93, 94–95 (9th Cir.1982). The rule "may be invoked 'when a complaint involving the same parties and issues has already been filed in another district.'" *Alltrade, Inc.*, 946 F.2d at 625 (quoting *Pacesetter Systems, Inc.*, 678 F.2d at 95). The rule "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *Pacesetter Systems, Inc.*, 678 F.2d at 95.

The first to file rule "is usually disregarded where the competing suits were filed merely days apart." *Ontel Products, Inc. v. Project Strategies Corp.*, 899 F.Supp. 1144, 1153 (S.D.N.Y.1995). Where "the difference in time of filing is so close, it is fair to treat the competing actions as contemporaneously filed." *Azurix Corp. v. Synagro Technologies, Inc.*, No. C.A. 17509, 2000 WL 193117 at *3 (Del.Ch. Feb.3, 2000) (one action filed on Friday and another filed on Monday).

▪ ■ The Court concludes that for all practical purposes, the second Arizona action and the second Oklahoma action were filed contemporaneously, and the first to file rule should not be applied in this instance. *See Azurix Corp.*, No. C.A. 17509, 2000 WL 193117 at *3. There is no dispute that the second Oklahoma action was filed on Friday, January 21, 2000, one business day prior to the filing of the second Arizona action on January 24, 2000. Moreover, a primary purpose of the first to file rule, namely efficient judicial administration, will not be served if the Court were to conclude that one action or the other was filed first, because the second Oklahoma action was transferred to this Court pursuant to 28 U.S.C. § 1404(a) and consolidated with the second Arizona action. Whether or not there was a "race to the courthouse" as the result of an anticipatory filing, as Southwest contends, matters very little now that the actions have been consolidated.

## B. Fed.R.Civ.P. 13(a)

■ Having determined that the second Arizona action was filed contemporaneously with the second Oklahoma action, the Court must now resolve whether either action contains claims which are compulsory counterclaims in the other. A claim is not a compulsory counterclaim under Rule 13(a) if, "at the time the action was commenced the claim was the subject of another pending action[.]" Fed.R.Civ.P. 13(a). Because the Court finds that the actions were contemporaneously filed, the declaratory judgment claim asserted in the second Oklahoma action was already the subject of the second Oklahoma action at the time the second Arizona action was filed, and it therefore cannot constitute a compulsory counterclaim in the second Arizona action. *See id.* Likewise, the claims asserted in the second Arizona action were already the subject of the second Arizona action at the time the second Oklahoma action was filed, and they cannot constitute compulsory counterclaims in the second Oklahoma action. *See id.*

However, ONEOK amended its Complaint in the second Oklahoma action on August 23, 2000, to include three additional claims: two fraudulent inducement counts, and one breach of contract count.[46] In these three additional counts, ONEOK alleges:

(1) Southwest failed to disclose material facts to ONEOK prior to ONEOK's execution of an amended merger agreement (ONEOK's Amended Complaint at ¶ 25);

(2) If Southwest had disclosed those material facts, ONEOK would not have

---

**46.** ONEOK has asserted identical counterclaims, as well as a counterclaim for declaratory judgment, in the second Arizona action.

entered into the amended merger agreement (*Id.* at ¶ 27);

(3) As a result of Southwest's fraudulent omissions, ONEOK was damaged (*Id.* at ¶¶ 31–32); and

(4) Southwest breached the original merger agreement in various respects (*Id.* at ¶ 34).

In the second Arizona action, Southwest asserts claims against ONEOK for fraud in the inducement, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. Southwest specifically alleges:

(1) ONEOK fraudulently induced Southwest to enter into the amended merger agreement (Southwest's Complaint at ¶¶ 81–84);

(2) ONEOK made numerous misrepresentations to Southwest and failed to disclose material facts, including the involvement of Rose and Irvin (*Id.* at ¶ 89);

(3) Southwest relied upon ONEOK's misrepresentations and nondisclosures and was induced not to notify ONEOK that it was in breach of the amended merger agreement (*Id.* at ¶ 90);

(4) ONEOK breached the amended merger agreement (*Id.* at ¶ 99); and

(5) ONEOK breached the implied covenant of good faith and fair dealing in the amended merger agreement (*Id.* at ¶ 108).

Applying the "liberal 'logical relationship' test" prescribed by *Pochiro,* 827 F.2d at 1249, the Court finds that ONEOK's fraudulent inducement and breach of contract claims in the second Oklahoma action are "so logically connected" to Southwest's claims in the second Arizona action that they arise out of the same transaction or occurrence. *See* Fed. R.Civ.P. 13(a). Because the Amended Complaint in the second Oklahoma action was filed approximately seven months after the second Arizona action commenced, the Court will identify Counts One, Two, and Three in the second Oklahoma action as compulsory counterclaims in the second Arizona action.[47]

## C. Choice of Law

Applying Arizona's choice of law principles, Southwest argues that Oklahoma law applies to all contract claims, pursuant to a forum selection clause, and Arizona law applies to Southwest's tort claims. Southwest further avers in its Supplemental Response Brief that Oklahoma law should apply to ONEOK's fraudulent inducement claim. ONEOK also contends that Oklahoma law applies to all of the claims between Southwest and ONEOK. Because ONEOK and Southwest agree that Oklahoma law governs the contract claims, the Court will yield to the parties on this issue.[48]

Southwest asserts only two tort claims against ONEOK in the second Arizona

47. As with certain of the claims between Southern Union and Southwest, there appears to be some duplicity with respect to the claims asserted in the second Oklahoma and second Arizona action between Southwest and ONEOK.

48. Southwest initially contends that the forum selection clause should apply to its contractual claim for breach of the implied covenant of good faith and fair dealing. (Southwest's Supplemental Brief at 14).

However, it then argues, without citation to legal authority, that Arizona law should apply to that claim because it is a tort claim. (*Id.* at 15). Because Southwest has not identified any differences between the law of Arizona and Oklahoma with respect to such claims, the Court will apply Oklahoma law. As Southwest points out, the remedy for a breach of this covenant "is ordinarily by action on the contract[.]" *Burkons v. Ticor Title Ins. Co. of California,* 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991).

action: fraudulent inducement and fraud. ONEOK has also asserted two fraudulent inducement tort claims. Because the Court has determined that ONEOK's tort claims constitute compulsory counterclaims in the second Arizona action, the Court will apply Arizona's choice of law rules to determine which law should apply to these claims. *See Abogados,* 223 F.3d at 934 (9th Cir.2000) ("court must apply the choice-of-law rules of the state in which it sits.").

As previously discussed at great length in this Order, claims of fraudulent inducement are governed by § 201 of the Restatement (Second) of Conflict of Laws. Like the fraudulent inducement claims, the fraud claim asserted by Southwest against ONEOK is also governed by § 201, because it is based upon "[t]he effect of misrepresentation ... upon a contract[.]"

Although Arizona courts have not expressly adopted § 201, the Court finds that Arizona would adopt the traditional view. *See Sparling,* 864 F.2d at 641. This result is consistent with Arizona law, because Arizona courts have repeatedly relied upon § 187 of the Restatement (Second) of Conflict of Laws. *See, e.g., Cardon v. Cotton Lane Holdings, Inc.,* 173 Ariz. 203, 207, 841 P.2d 198, 202 (1992); *Landi v. Arkules,* 172 Ariz. 126, 130, 835 P.2d 458, 462 (App.1992).

The Court must therefore apply § 187 of the Restatement (Second) of Conflict of Laws to determine whether the forum selection clause should be enforced with respect to the fraudulent inducement and fraud claims. *See* § 201, Illustration 1 (the choice of law provision must still be effective under § 187 before it is applied).

As previously stated, this analysis is governed by § 187(2). *See* discussion *supra* at 1029. The Court must thus determine whether Oklahoma "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice," or whether it "would be contrary to a fundamental policy of a state which has a materially greater interest than" Oklahoma if the Court applies Oklahoma law in the determination of the fraudulent inducement claims. § 187(2)(a) & (b).

■ The Court finds that Oklahoma has a substantial relationship to the parties. Southwest alleges in its Complaint that ONEOK "is a corporation organized and existing under the laws of the State of Oklahoma with its principal place of business in Tulsa, Oklahoma[,]" and it "serves approximately 1.4 million customers in Kansas and Oklahoma." (Southwest's Complaint at ¶ 2). *See* § 187, comment f (the substantial relationship requirement is met "where one of the parties is domiciled or has his principal place of business" in the selected state); *Consul Limited,* 802 F.2d at 1147 (the substantial relationship test is met if one of the parties resides in the selected state); *see also Ciena Corp.,* 203 F.3d at 324 (substantial relationship test is met where one of the parties is incorporated in the selected state).

The Court further finds that it would not contravene public policy to apply Oklahoma law to these claims. Neither ONEOK nor Southwest contends that the law of Oklahoma is any different from the law of Arizona with respect to fraudulent inducement or fraud claims. The Court will therefore apply Oklahoma law to the fraudulent inducement and fraud claims asserted by Southwest and Oneok.

*Conclusion*

**A. First Arizona Action**

The claims remaining in the first Arizona action, and their status, are as follows:

| Count | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 3 | Fraud in the Inducement | Southwest and Maffie | Counterclaim in Nevada | California |
| 4 | Breach of Contract | Southwest | Counterclaim in Nevada | California |
| 5 | Breach of the Covenant of Good Faith and Fair Dealing | Southwest | Counterclaim in Nevada | California |
| 6 | Rescission | Southwest | Counterclaim in Nevada | California |
| 7 | Tortious Interference with a Business Relationship | ONEOK | Counterclaim in Oklahoma | Arizona |
| | | Dubay, Irvin, Rose, and Gaberino | Claim in Arizona | Arizona |
| 8 | Tortious Interference with Contractual Relations | Dubay, Irvin, Rose, and Gaberino | Claim in Arizona | Arizona |

### B. Nevada Action

#### 1. Southwest's Claims

With respect to the Complaint filed in the Nevada action, the claims, and their status, are as follows:

| Count | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Breach of Contract | Southern Union | Claim in Nevada | California |
| 2 | Breach of the Implied Covenant of Good Faith and Fair Dealing | Southern Union | Claim in Nevada | California |
| 3 | Misappropriation of Trade Secrets | Southern Union | Claim in Nevada | Nevada |
| 4 | Intentional Interference with Contract | Southern Union | Claim in Nevada | Nevada |
| 5 | Intentional Interference with Prospective Economic Advantage | Southern Union | Claim in Nevada | Nevada |
| 6 | Declaratory Relief (on Agreement) | Southern Union | Claim in Nevada | California |
| 7 | Unfair Competition (Under | Southern Union | Claim in Nevada | California |

California Law)

| | | | | |
|---|---|---|---|---|
| 8 | Violation of Section 14(e) of the Securities Exchange Act | Southern Union | Claim in Nevada | Federal |

### 2. Southern Union's Claims

With respect to the counterclaims asserted in the Nevada action, their status is as follows:

| Counter-claim | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Declaratory Judgment on Fraud in the Inducement and Breach of Contract | Southwest | Counterclaim in Nevada | California |
| 2 | Declaratory Judgment of Revocation Based on the Terms of the Contract | Southwest | Counterclaim in Nevada | California |
| 3 | Rescission of Letter Agreement | Southwest | Counterclaim in Nevada | California |
| 4 | Breach of Contract | Southwest | Counterclaim in Nevada | California |
| 5 | Breach of the Covenant of Good Faith and Fair Dealing | Southwest | Counterclaim in Nevada | California |
| 6 | Mistake of Fact | Southwest | Counterclaim in Nevada | California |
| 7 | Injunctive Relief (to maintain the status quo) | Southwest | Counterclaim in Nevada | Not Briefed |

### C. Second Arizona Action

### 1. Southwest's Claims

As for the claims asserted by Southwest in the second Arizona action, their status is as follows:

| Count | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Fraud in the Inducement | ONEOK | Claim in Arizona | Oklahoma |
| 2 | Fraud | ONEOK | Claim in Arizona | Oklahoma |
| 3 | Breach of Contract | ONEOK | Claim in Arizona | Oklahoma |

| | | | | |
|---|---|---|---|---|
| 4 | Breach of the Implied Covenant of Good Faith and Fair Dealing | ONEOK | Claim in Arizona | Oklahoma |
| 5 | Declaratory Relief (on the amended merger agreement) | ONEOK | Claim in Arizona | Oklahoma |
| 6 | Breach of Contract | Southern Union | Court Declines to Rule | California |
| 7 | Breach of the Covenant of Good Faith and Fair Dealing | Southern Union | Court Declines to Rule | California |
| 8 | Intentional Interference with Contract | Southern Union | Court Declines to Rule | Court Declines to Rule |
| 9 | Misappropriation of Trade Secrets | Southern Union | Court Declines to Rule | Court Declines to Rule |
| 10 | Declaratory Relief (on the contract) | Southern Union | Court Declines to Rule | California |

### 2. ONEOK's Claims

With respect to the counterclaims asserted in the second Arizona action, their status is as follows:

| Counter-claim | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Fraudulent Inducement— Rescission | Southwest | Counterclaim in Arizona | Oklahoma |
| 2 | Fraudulent Inducement— Damages | Southwest | Counterclaim in Arizona | Oklahoma |
| 3 | Breach of Contract | Southwest | Counterclaim in Arizona | Oklahoma |
| 4 | Declaratory Judgment (on the merger agreements) | Southwest | Claim in Oklahoma | Oklahoma |

### D. First Oklahoma Action

### 1. ONEOK's Claims

The status of the claims asserted in the first Oklahoma action is as follows:

| Count | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Breach of Contract | Southern Union | Claim in Oklahoma | Not Briefed |
| 2 | Intentional Interference with Contract | Southern Union | Claim in Oklahoma | Not Briefed |
| 3 | Intentional | Southern | Claim in Oklahoma | Not Briefed |

| | Interference with Prospective Economic Advantage | Union | | |
|---|---|---|---|---|
| 4 | Declaratory Judgment | Southern Union | Claim in Oklahoma | Not Briefed |

### 2. Southern Union's Claims

| Counter-claim | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Declaratory Judgment on Enforceability of Contract | ONEOK | Counterclaim in Oklahoma | Not Briefed |
| 2 | Declaratory Judgment on Interpretation of the Contract | ONEOK | Counterclaim in Oklahoma | Not Briefed |

### E. Second Oklahoma Action

The status of the claims [49] asserted in the second Oklahoma action is as follows:

| Count | Claim | Against | Status | Applicable Law |
|---|---|---|---|---|
| 1 | Fraudulent Inducement— Rescission | Southwest | Counterclaim in Arizona | Oklahoma |
| 2 | Fraudulent Inducement— Damages | Southwest | Counterclaim in Arizona | Oklahoma |
| 3 | Breach of Contract | Southwest | Counterclaim in Arizona | Oklahoma |
| 4 | Declaratory Judgment (on the merger agreements) | Southwest | Claim in Oklahoma | Oklahoma |

**IT IS THEREFORE ORDERED** that the First R & R (Doc. # 707) is **ADOPTED,** Dioguardi's Motion to Dismiss (Doc. # 377) is **GRANTED,** and all claims against Dioguardi are **DISMISSED** with prejudice. Dioguardi is hereby terminated from this action.

**IT IS FURTHER ORDERED** that the Second R & R (Doc. # 731) is **ADOPTED IN PART,** and ONEOK's Motion to Dismiss (Doc. # 352) and Irvin's Joinder (Doc. # 367) are **GRANTED IN PART** and **DE-** **NIED IN PART** to the extent set forth in this Order.

**IT IS FURTHER ORDERED** that Count Three in the Second Amended Complaint is **DISMISSED** with prejudice as to Zub, ONEOK, Dubay, Gaberino, Rose, Irvin, and Hartley, and Hartley and Zub are hereby terminated from this action. Count Three is not dismissed with respect to Southwest or Maffie. Count Three is identified as a counterclaim in the Nevada

49. No counterclaims were asserted in the sec- ond Oklahoma action.

action, and California law shall apply to Count Three.

IT IS FURTHER ORDERED that Counts Seven and Eight are **DISMISSED** with prejudice as to Maffie, and Count Eight is **DISMISSED** with prejudice as to ONEOK. Count Seven is identified as a compulsory counterclaim in the Oklahoma action, but only with respect to ONEOK. Count Seven is identified as a direct claim in the Arizona action as to Defendants Irvin, Rose, Dubay, and Gaberino. Arizona law shall apply to Counts Seven and Eight.

IT IS FURTHER ORDERED that California law shall apply to all contract claims between Southwest and Southern Union.

IT IS FURTHER ORDERED that Nevada law shall apply to the tort claims asserted by Southwest in the Nevada action.

IT IS FURTHER ORDERED that Oklahoma law shall apply to all claims asserted by Southwest against ONEOK in the second Arizona action and to all claims asserted by ONEOK against Southwest in the second Arizona and second Oklahoma actions.